In the
United States Court of Appeals
For the Seventh Circuit

Nos. 95-3291, 00-1449 & 00-2788

Peabody Coal Company and
Old Republic Insurance Company,

Petitioners,

v.

Jane W. McCandless and Director, Office
of Workers' Compensation Programs,

Respondents.

Petitions to Review Orders of the
Benefits Review Board, Department of Labor.

Argued November 30, 2000--Decided June 29, 2001

Before Flaum, Chief Judge, and Easterbrook
and Rovner, Circuit Judges.

Easterbrook, Circuit Judge. When he died
of heart failure in 1991 at the age of
60, Elwood McCandless was afflicted with
cancer and emphysema in addition to his
cardiac and circulatory diseases.
Elwood's widow, Jane, contends that he
also was disabled by coal workers'
pneumoconiosis as a result of more than
25 years' exposure to dust in the mines.
Many x-rays taken over the last decade of
Elwood's life revealed little evidence of
black lung disease. But an autopsy is the
best way to obtain information that will
decide the question, see Peabody Coal Co.
v. Director, OWCP, 972 F.2d 178, 182 (7th
Cir. 1992) (Railey), and pathologist
Henry W. Bockelman performed one on
Elwood's body. Dr. Bockelman attributed
Elwood's death to vascular disease,
myocardial fibrosis, and adenocarcinoma,
adding that Elwood also exhibited
"prominent anthracotic pigment deposition
with reactive fibrosis and polarizable
debris, suggestive of silica and
interstitial fibrosis fitting under Type
III lesion", which he believed
demonstrated pneumoconiosis. Five other
physicians, all board-certified in their
specialties, examined the tissue slides
that Bockelman had created and concluded
that they show no evidence of

pneumoconiosis. One of these (Jerome Kleinerman, a pathologist) added that Bockelman's analysis depended on views expressed in a 1981 article that had been discredited in the medical literature, and that as a result Bockelman's conclusion is worthless.

These divergent interpretations presented a problem for the administrative law judge. Lawyers are uncomfortable with scientific controversies--for good reason, because legal training does not supply the tools needed to resolve technical disputes. Nonetheless, many statutes (of which the Black Lung Benefits Act is an example) make entitlements turn on scientific knowledge, and the alj set about to deal with the conflicting conclusions of these physicians--but on legal rather than medical grounds. The alj wrote:

I place greater weight on Dr. Bockelman's opinion because he performed the actual autopsy . . . and is a board-certified pathologist. . . . The opinions of Drs. Crouch, Kleinerman and Naeye also merit weight because they too are board-certified pathologists and appeared to provide well-reasoned explanations to discredit Dr. Bockelman's conclusion. Dr. Tuteur is also a well-trained physician, although not a pathologist. Placing more weight on the opinion of the pathologist who performed the autopsy, as I have the leeway to do, I find that the Claimant has established pneumoconiosis pursuant to [20 C.F.R.] sec.718.202(a)(2).

There was a little more to the alj's conclusion: he relied on the fact that 2 out of 31 readings of the many x-rays had been positive for pneumoconiosis, and that other physicians who examined Bockelman's report (and perhaps some of the evidence) found no errors in his analysis. Later the Benefits Review Board deemed the alj's reliance on the positive x-ray readings inappropriate, leaving only the conclusions based on evidence obtained during the autopsy. On that score, the brb concluded, an alj is entitled to favor the findings of an autopsy prosector without getting into a scientific debate about the quality of the prosector's reasoning.

Although we understand why the alj and the brb wanted to avoid the medical controversy, their approach does not conduce to finding the truth. A scientific dispute must be resolved on scientific grounds, rather than by declaring that whoever examines the cadaver dictates the outcome. See Wilder v. Chater, 64 F.3d 335 (7th Cir. 1995); Sahara Coal Co. v. Fitts, 39 F.3d 781 (7th Cir. 1994). If there were a medical reason to believe that visual scrutiny of gross attributes is more reliable than microscopic examination of tissue samples as a way to diagnose pneumoconiosis, then relying on the conclusions of the prosector would be sensible. But neither the alj nor the brb made such a finding. The mine operator contends--and on this record we have no reason to doubt--that examining tissue samples under a microscope, and testing them for silica, is the best way to diagnose black lung disease. What we have, therefore, is a conflict among physicians based on their analysis of the tissue samples. Bockelman's visual examination of the whole lung played little or no role. The alj and brb preferred the results of Bockelman's analysis of the slides just because that analysis was done by the prosector. This is not a rational ground of decision. It is no more sensible than saying that the results of the plaintiffs' expert in Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), had to be accepted just because he examined the supposedly defective tire. Yet the Court held in Kumho that junk science cannot be rescued by some principle such as a doctrine that courts must receive the views of any expert who does hands-on work. Bad science is bad science, even if offered by the first expert to express a view. In Kumho the Court held that the views of the plaintiffs' tire-failure analyst were too unreliable to be admissible in evidence. Under the approach of the alj and the brb in this case, however, those same views not only would be admissible but also would trump the conclusions of five other experts who supplied scientifically sound analyses but did not manipulate the tire.

The approach used by the alj and brb in this case appears to be a vestige of the "true doubt rule," under which a conflict in the evidence was resolved in the

miner's favor. Director, OWCP v. Greenwich Collieries, 512 U.S. 267 (1994), holds the true-doubt rule invalid under the Administrative Procedure Act, because it relieves the claimant of his burden of persuasion. See also Allentown Mack Sales & Service, Inc. v. NLRB, 522 U.S. 359 (1998). The preference for the conclusions of the autopsy prosector has all of the true-doubt rule's vices without its redeeming virtue (for the true-doubt rule at least required true doubt, an equipoise in the evidence, while the preference for the prosector's views can overcome all of the scientifically valid evidence in the record). Preferring the prosector's conclusion, for no better reason than that the prosector wields the scalpel, is about as sensible as preferring in an antitrust case the conclusions of whatever expert devoted the most time to preparing his report. Cf. In re Brand Name Prescription Drugs Antitrust Litigation, 186 F.3d 781, 786 (7th Cir. 1999) (failure to conduct an in-depth study of an industry, and completion of an analysis quickly, are not valid grounds for excluding expert testimony).

Since Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), courts have understood the importance of ensuring that supposedly scientific testimony meets minimum scientific standards of accuracy. See also Weisgram v. Marley Co., 528 U.S. 440, 445 (2000); General Electric Co. v. Joiner, 522 U.S. 136 (1997). Our dispute does not entail a contest of admissibility. But it makes little sense to use scientific standards in performing the gatekeeping function and then permit the dispute on the merits to be resolved by arbitrary considerations, such as who wore the latex gloves and or had superior credentials. Daubert does not apply directly in black lung cases, because it is based on Fed. R. Evid. 702, which agencies need not follow. Agencies relax the rules of evidence because they believe that they have the skill needed to handle evidence that might mislead a jury. See Richardson v. Perales, 402 U.S. 389 (1971). They have a corresponding obligation to use that skill when evaluating technical evidence. Neither the alj nor the brb did this, however; both avoided the medical dispute by adopting a non-medical rule that

physicians who work in white smocks are more reliable than physicians who do their work in the laboratory. As that preference has no apparent medical basis--and as it contradicts many decisions requiring agencies to resolve scientific controversies on the merits rather than through legal legerdemain--the result cannot stand. See, e.g., Railey, 972 F.2d at 182; Stephens v. Heckler, 766 F.2d 284 (7th Cir. 1985). An agency must act like an expert if it expects the judiciary to treat it as one. See Chicago Board of Trade v. SEC, 187 F.3d 713 (7th Cir. 1999); Bechtel v. FCC, 10 F.3d 875 (D.C. Cir. 1993). Railey is directly on point; it holds that the alj may not automatically credit the conclusions of an autopsy prosector but must supply a valid rationale for adopting them. Here the only rationale was--that Bockelman was the prosector. That's just a restatement of the rule that Railey disapproved.

We are not authorized to resolve the medical dispute as an initial matter, so the case must be remanded to the agency for reconsideration. Two other disputes lurk in this record, and we mention them briefly in an effort to head off further troubles. If Elwood had pneumoconiosis, the next question is whether that disease was disabling. Given his many other ailments, it is hard to see how it could have been, for the other problems appear to be sufficient to cause disability (implying that pneumoconiosis was not a necessary condition of disability). See Freeman United Coal Mining Co. v. Foster, 30 F.3d 834 (7th Cir. 1994); Freeman United Coal Mining Co. v. Stone, 957 F.2d 360 (7th Cir. 1992). The record contains many medical assessments attributing Elwood's health problems to heart disease, cancer, and emphysema. The alj found all of these opinions wanting because they were not shared by the physician who treated Elwood during his final three years. Yet we have disapproved any mechanical rule that the views of a treating physician prevail. See Consolidation Coal Co. v. OWCP, 54 F.3d 434, 438 (7th Cir. 1995). "[I]t is irrational to prefer the opinion of the treating physician, who is often not a specialist, over the opinion of a nontreating specialist solely because one physician is the treating physician." Railey, 972 F.2d at 180 (emphasis in

original). Treating physicians often succumb to the temptation to accommodate their patients (and their survivors) at the expense of third parties such as insurers, which implies attaching a discount rather than a preference to their views.

The alj must have a medical reason for preferring one physician's conclusion over another's. In this case the alj recognized that the treating physician's views may not be accepted unless there is a good reason to believe that they are accurate. The alj thought that he had such a reason: Dr. Gelhausen was Elwood's treating physician, and treating physicians are (by definition) familiar with patients' medical condition during life. That's just a restatement of the preference. Circular reasoning cannot avoid the rule. If there is a reason why Dr. Gelhausen's observations have medical significance, that's one thing; but the fact that Gelhausen examined Elwood McCandless before his death does not demonstrate that Elwood was disabled by pneumoconiosis. Dr. Gelhausen's beliefs must be supported by medical reasons if they are to be given legal effect.

The other potentially recurring subject is attorneys' fees. The alj calculated the fees of Jack N. VanStone, who represents Jane McCandless, at $200 per hour. The mine operator objected, observing that this hourly rate exceeds what VanStone charges his paying clients. (At oral argument VanStone conceded that the highest rate he has ever charged a paying client is $150 per hour.) Because the rate chargeable against the mine operator must be market-based, see Gusman v. Unisys Corp., 986 F.2d 1146, 1150 (7th Cir. 1993), without a premium for the contingent nature of the compensation, see Burlington v. Dague, 505 U.S. 557 (1992), the mine operator asked that VanStone's rate be reduced. See also Cole v. Wodziak, 169 F.3d 486, 488-89 (7th Cir. 1999); Eirhart v. LibbyOwensFFr Co., 996 F.2d 846 (7th Cir. 1993). The brb described the mine operator's position, added "Employer's objection is noted", and then immediately stated that "the hourly rate of $200.00 [is] reasonable in light of the services performed." The Board never addressed the operator's contention that no rate exceeding the attorney's normal market price can be

deemed "reasonable." For that matter, neither the alj nor the brb gave any reason for deeming $200 a "reasonable" rate. It is a number plucked from a hat. Like the other critical issues resolved by the agency in this case, this must be reexamined.

The Board's order is vacated, and the case is remanded for further proceedings consistent with this opinion.