In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-3315

CONSOLIDATION COAL COMPANY,

*Petitioner,*

*v.*

DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS,
and JAMES E. STEIN,

*Respondents.*

Petition for Review from the Benefits Review Board
of the United States Department of Labor
BRB No. 00-954 BLA

ARGUED APRIL 9, 2002—DECIDED JUNE 25, 2002

Before FLAUM, *Chief Judge*, and COFFEY and KANNE,
*Circuit Judges*.

COFFEY, *Circuit Judge*. Petitioner Consolidation Coal
Company ("Consol") appeals an order of the Benefits Review
Board of the United States Department of Labor ("DOL")
granting Respondent James E. Stein's ("Stein") claim for
relief under the Black Lung Benefits Act. We enforce the
decision of the Board.

**I.**

This is the second time that Stein's claim for benefits, originally filed in July 1994, has come before the court. Stein worked as a mechanic at Consol's Burning Star mine in DeSoto, Ill., from 1978 to 1989, when the mine was closed and abandoned, and he filed for black lung benefits after his respiratory ailments became so debilitating that he was unable to continue working as a carpenter. Administrative Law Judge ("ALJ") Mollie W. Neal took Stein's claim under submission and, after review, issued an order awarding benefits in March 1997.

Consol appealed, and we granted the petition and remanded this case in March 1999, noting that "the ALJ found the existence of pneumoconiosis but failed to discuss a CT scan that was taken of Stein's thorax" and interpreted by the coal company's physician, Dr. Robert M. Bruce, as negative for black lung disease.[1] In remanding the case, we stated that a CT scan plays "an increasing role in the radiologic evaluation of occupational lung disease" and is a "valuable part of the evaluation process." We added: "Without a written discussion of the relevant medical evidence, including the CT scan, we cannot determine whether the ALJ discharged her duty under the law before determining Stein suffered from pneumoconiosis. We, therefore, cannot determine whether her decision was rational and supported by substantial evidence." Thus, this case was remanded for reconsideration and an explanation of whether Stein could invoke the presumption that he has black lung

---

[1]  A computed tomography ("CT") scan or a high-resolution computed tomography ("HRCT") scan may be useful for the identification and analyzation of abnormalities that may be present on the soft tissue within the body. *See*, *e.g.*, M. Akira, *High-Resolution CT in the Evaluation of Occupational and Environmental Disease*, 40(1) RADIOL. CLIN. N. AM. 43 (2002); K. Kim et al., *Imaging of Occupational Lung Disease*, 21(6) RADIOGRAPHICS 1371 (2001).

disease despite Dr. Bruce's opinion that the CT scan ruled out such a possibility.

On remand, Judge Neal found that Dr. Bruce's negative reading of the CT scan was unreliable and unconvincing, as the record is bereft of any evidence reflecting that Dr. Bruce has any specialized knowledge, training, or experience in the field of radiology. In the penultimate sentence of her opinion, the judge stated: "I have now considered the CT scan evidence of record, as instructed by the Court of Appeals, and find that the outcome remains unchanged. . . . Claimant has established the existence of pneumoconiosis." The coal company once again appeals, now alleging that the ALJ erred in: (1) invoking the statutory presumption that Stein has pneumoconiosis; and (2) failing to find that the coal company rebutted this presumption by proffering evidence that Stein's disability is unrelated to mining and instead is wholly attributable to asthma, bronchitis, or smoking.

## II.

Stein suffered daily exposure to coal dust during his eleven years of employment at Consol, where he worked from 1978-89 in a dilapidated garage with conditions that were unhealthful, to say the least. The garage was located but an eighth of a mile from the tipple of the mine—a notoriously dusty area where coal is crushed for shipment to customers. Dust would regularly fall in Stein's face as he performed his assigned task of repairing and maintaining the bulldozers and trucks used throughout the mine. Stein's job duties required that he get on his back and wriggle under the vehicles in order to disassemble machine parts and drag them to other areas of the shop for refurbishing. The parts frequently weighed as much as forty pounds and were "packed full of coal dust, all the way to the top of the frame." Yet it is unclear from the record whether the com-

pany provided its mechanics with face masks, despite the fact that the wind often blew coal dust into their worksta- tions and they were in daily contact with soot-covered ma- chinery.[2]

The medical record introduced into evidence included a CT scan, two x-rays, numerous medical reports and test results, several depositions, and a transcript of testimony taken at a hearing in Carbondale, Ill. While the parties agree that Stein is suffering from obstructive bronchitis and asthma, they disagree as to whether he has black lung disease or whether his exposure to coal dust aggravated his asthmatic bronchitis. The petitioner relies partly on the opinion of Dr. Locke, a physician who opined that Stein's x-ray was negative for pneumoconiosis.[3] Consol also relies heavily on the opinion of Dr. Robert M. Bruce, who testified that neither the x-ray nor the CT scan of Stein's thorax es- tablished the presence of black lung disease.[4] Based on his

---

[2] The structural forces and the massive, widespread opposition raised by coal companies in their efforts to prevent miners from improving their miserable working conditions and obtaining qual- ity health care has been documented by numerous commentators. *See generally* C.M. DUNCAN, WORLDS APART: WHY POVERTY PER- SISTS IN RURAL AMERICA 1-72 (1999); A. DERICKSON, BLACK LUNG: ANATOMY OF A PUBLIC HEALTH DISASTER (1998); M. Gochfeld, *Books*, 25 J. HEALTH POL. POL'Y & L. 782 (2000) (book review); T.F. Cogan, *Is the Doctor Hostile?*, 97 W. VA. L. REV. 1003 (1995).

[3] Without providing any additional elaboration upon the basis of his opinion, a "Dr. Locke" filled out and submitted a one-page, standardized form indicating that he examined Stein's x-rays on March 25, 1996, checking the box labeled "film is completely negative." Dr. Locke's credentials, area of specialization, and place of business are unexplained in the record. (EX 1, Exh. 1.)

[4] Dr. Bruce is an active practitioner and an associate professor of pulmonology at Washington University Medical Center in St.

(continued...)

examination of the CT scan and review of Stein's medical history, Dr. Bruce concluded that Stein's disability is unrelated to his work as a coal miner and cannot be attributed to pneumoconiosis. Stein, on the other hand, bolsters his claim with the testimony of two B-readers,[5] one of whom also is a board certified radiologist, who concluded that the x-ray was positive for black lung.[6] Stein also relies on the testimony of Dr. Robert A.C. Cohen, who determined that Stein suffers from black lung disease and that his additional pulmonary problems were substantially aggravated by exposure to coal dust.[7]

After a review of the record, ALJ Neal relied upon and adopted the opinions of those medical experts who found that Stein's spirometry, blood gas, pulmonary function and

---

(...continued)

Louis, Mo., who is board certified in internal medicine and has published articles involving respiratory diseases. He has testified on behalf of both miners and operators during the past several years. However, he is neither a B-reader nor a radiologist.

[5] "A 'B-reader' is a physician who has demonstrated proficiency in assessing and classifying X-ray evidence of pneumoconiosis by successful completion of an examination conducted by or on behalf of the Department of Health and Human Services." *Ziegler Coal Co. v. OWCP*, 23 F.3d 1235, 1237 n.3 (7th Cir. 1994).

[6] The physicians who concluded that the x-ray was positive, Dr. Mathur and Dr. Pathak, are certified B-readers. Dr. Mathur also is a board certified radiologist.

[7] Dr. Cohen is a faculty member at the University of Illinois Medical Center in Chicago and the director of the Black Lung Clinics Program at Cook County Hospital in Chicago, Ill. He also is a respected advisor to the HHS-funded National Coalition of Black Lung and Respiratory Disease Clinics. He has published numerous articles about occupational health diseases and is a B-reader.

x-ray tests established the existence of pneumoconiosis.[8]
The judge explicitly found that Dr. Bruce's negative reading
of the CT scan was unreliable, for the judge was of the opin-
ion that the record failed to establish that he has sufficient
knowledge, training, or expertise in reading and interpret-
ing a CT scan for the diagnosis of legal pneumoconiosis.
Judge Neal also determined that the coal company failed
to rebut the inference that Stein's eleven years of employ-
ment at the Burning Star coal mine was the legal cause
of his disability. Based upon all of the medical informa-
tion and in view of Stein's eleven years of coal mine employ-
ment, the judge again ruled that Stein is entitled to bene-
fits, and the Board affirmed.

### III.

The issue before us is whether the ALJ's award of benefits
under the Black Lung Benefits Act was lawful, rational,
and supported by substantial evidence. The governing reg-
ulations provide that "[a] finding of pneumoconiosis may be
made," and the claimant will thereafter be presumptively
entitled to benefits, if he: (1) establishes that he worked
in the coal mines for ten years or more; and (2) produces
an x-ray test that, in the opinion of a qualified physician,
discloses the presence of black lung disease. 20 C.F.R.

---

[8] The pulmonary function tests included measurements of Stein's
$FEV_1$, FET1/FVC, $FEF_{25-75\%}$, MVV, TLC, DLCO, and DL/VA val-
ues. The cardiopulmonary exercise and blood gas tests included
measurements of Stein's pH, $PO_2$, $PCO_2$, $HCO_3$, BE, $O_2CT$, and
$O_2$ SAT% levels. The pulmonary function tests produced uniform-
ly poor results, ranging from 43 to 89 percent below the predicted
normal range. In addition, Dr. Cohen testified that he was un-
able to "rule out" the possibility that Stein had "gas exchange
problems with exercise," for Stein was unable to complete the
cardiopulmonary exercise tests due to shortness of breath. (CX 6
at 2-3.)

§ 718.202(a)(1). This is referred to as the "10-year presumption." *Crowe v. Director*, 226 F.3d 609, 614 n.7 (7th Cir. 2000). Once the miner is entitled to such a presumption, the burden shifts to the employer to demonstrate that: (1) the miner does not truly have pneumoconiosis; (2) is not totally disabled; or (3) is not disabled by pneumoconiosis. *Freeman United Coal Mining Co. v. Summers*, 272 F.3d 473, 481 (7th Cir. 2001).

## A.

After examining the x-ray of Stein's chest and considering and crediting the testimony of the two B-readers (one of whom also is a board certified radiologist), Judge Neal ruled that Stein was entitled to the presumption that he is totally disabled by pneumoconiosis. The petitioner now contends that the ALJ's decision is irrational because it conflicts with the opinion of Dr. Robert M. Bruce, the company-retained physician who testified that Stein's CT scan was negative for pneumoconiosis.

Despite the fact that two qualified B-readers (including a board certified radiologist) determined that Stein's x-rays were positive,[9] the coal company argues that we must treat Dr. Bruce's negative reading of Stein's CT scan as conclusive because it ostensibly is the most "sophisticated and sensitive diagnostic test" available. According to the employer: "A CT scan, which is negative for the presence of pneumoconiosis, prohibits a rational finding of pneumoconiosis based solely on positive x-ray findings." We disagree

---

[9] It is unclear why neither Dr. Mathur, Dr. Pathak, nor Dr. Cohen was given the opportunity to examine the CT scan printouts. This evidentiary record would have been much more complete if these physicians had been allowed to review the printouts and attempt to rebut directly Dr. Bruce's testimony concerning the probative value of the same.

with the employer's argument, for it contradicts the very language of the most recent guidelines promulgated by the DOL, which make clear that a CT scan is not a magic bullet: Even if a CT scan is negative, the ALJ may conclude from the other medical and scientific testimony available that a miner has legal pneumoconiosis.[10]

The Department of Labor has rejected the view that a CT scan, by itself, "is sufficiently reliable that a negative result effectively rules out the existence of pneumoconiosis." 65 Fed. Reg. 79,920, 79,945 (Dec. 20, 2000). After considering the opinions of four commentators offered during an administrative rulemaking proceeding, the agency made a finding, which is entitled to deference, *Old Ben Coal Co. v. Scott*, 144 F.3d 1045, 1048 (7th Cir. 1998), that a negative CT scan, standing alone, need not be given controlling weight in the evaluation of a black lung benefits claim because "[t]he statutory definition of 'pneumoconiosis' . . . encompasses a broader spectrum of diseases than those pathological conditions which can be detected by clinical diagnostic tests such as x-rays or CT scans." According to the agency:

> For purposes of the Black Lung Benefits Act, "pneumoconiosis" includes any "chronic dust disease of the lung and its sequelae, including respiratory and pulmonary

---

[10] The most recent regulations were published in the Federal Register on December 20, 2000, more than six months after Judge Neal rendered her decision but nearly seven months before the Board affirmed the award of benefits in this case. The DOL invited both parties to file objections to the Board's application of the new regulations when it conducted its administrative review of Judge Neal's decision. Neither party availed itself of this opportunity to do so. (Doc. Nos. 28-48.) Accordingly, as in *Summers*, 272 F.3d at 479-84, we have discussed and applied the existing regulations whenever they were relevant to the issues raised in this appeal.

impairments, arising out of coal mine employment." A CT scan may provide reliable evidence in a particular claim that the miner does not have any evidence of the disease which can be detected by that particular diagnostic technique. *The record, however, does not contain any medical evidence demonstrating the capacity of CT scans to rule out the existence of all diseases "arising out of coal mine employment." The Department therefore cannot accept the commentator's position that a negative CT scan is self-sufficient evidence that the miner does not have "pneumoconiosis" for purposes of the statute.*

65 Fed. Reg. at 79,945-46 (internal citations omitted; emphasis supplied).

In urging us to disregard the Department's regulations, the coal company refers us to other black lung adjudications where ALJs have given greater weight to negative autopsy reports as contrasted to positive x-ray readings. *See*, *e.g.*, *Terlip v. Director*, 8 BLR 1-363 (1985). The coal company argues: "If the CT scan is a more sophisticated and sensitive diagnostic test [than an x-ray], and if the scan shows no evidence of pneumoconiosis," then it is just as irrational to invoke the presumption of disability in such a case as it would be to "award benefits in a situation where x-ray findings are positive for black lung disease but the more sophisticated autopsy fails to disclose evidence of the disease."

The employer's argument is fatally flawed in several respects, the most obvious being the assumption that the medical community has reached a consensus about the singular, best method for diagnosing pneumoconiosis—whether it is with the CT scan or with pathological autopsies, x-rays read by B-readers, or the myriad of other commonly used expert diagnostic tests undertaken with

or without a CT scan.[11] The DOL has determined that no single test or procedure, standing alone, is entitled to controlling weight as a matter of law.[12] 65 Fed. Reg. at 79,945.

Multiple individuals informed the DOL that negative CT scans, when viewed in isolation, may not be "reliable diagnostic tools for evaluating the presence or absence of pneumoconiosis because no standardized criteria exist for interpreting them." *Id.*; *see also* 15 GRAY & GORDY, ATTORNEY'S TEXTBOOK OF MEDICINE ¶ 205B.61(5) (1994) (noting that in black lung benefits proceedings, "no standards of interpretation have been established for CT findings, nor has their relationship to levels of dust exposure been determined."); M. Remy-Jardin et al., *Coal Workers Pneumoconiosis*, 177(2) RADIOLOGY 363, 369 (1990). Thus, any decision to deny a claim for benefits must be based on the

---

[11] Consol's further assumption that autopsy reports will often rule out a positive diagnosis made from x-ray readings rests upon a grave misunderstanding of medical reality that has been rejected by both the Supreme Court and the Surgeon General. *See Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 32 (1976) ("In particular, the findings of the Surgeon General and others indicated . . . that autopsy frequently disclosed pneumoconiosis where x-ray evidence had disclosed none; and that pneumoconiosis may be masked from x-ray detection by other disease.").

[12] *See*, *e.g.*, *Peabody Coal Co. v. McCandless*, 255 F.3d 465, 468 (7th Cir. 2001) (stating that an ALJ may never rationally rule "that whoever examines the cadaver . . . dictates the outcome" but may give greater weight to an autopsy report if the judge articulates a valid reason for doing so); *Peabody Coal Co. v. Director*, 972 F.2d 178, 182 (7th Cir. 1992) (holding that while it is "permissible for the ALJ to prefer the testimony of the autopsy physician over the opinions of those physicians who did not view the miner's lung in its entirety," we have not "condone[d] such a preference as a blanket rule").

totality of the medical and scientific evidence contained in the record—not the results of the scan alone.

According to Dr. Q.T. Pham:

> Recent advances in medicine and associated technologies have resulted in the development of other imaging techniques, including computerised tomography (CT), magnetic resonance imaging (MRI), and ultrasonography. However, conventional chest radiography remains the principal technique on which most occupational chest disease physicians rely, although the other imaging techniques will no doubt have an important role to play in the future. *Current advice is that "radiological diagnosis must be deductive in the light of the other, relevant data and spot diagnosis from the image alone must be avoided at all costs."*
>
> *       *       *       *
>
> [A]s the newer imaging techniques already referred to (computed tomography, magnetic resonance imaging (MRI), and ultrasonography) all have advantages and drawbacks, they are also likely to continue as complementary to radiography for some time to come. . . . *In addition, it must also be emphasized that one radiological observation alone is not enough to arrive at a firm diagnosis of pneumoconiosis; this should be based on a number of characteristic combinations of signs that form patterns, along with other evidence such as work at an exposed place.*

Q.T. Pham, *Chest Radiography in the Diagnosis of Pneumoconiosis*, 5(5) INT. J. TUBERC. LUNG DIS. 478, 479-80 (2001) (emphasis supplied).

At present, "[t]he clinical diagnosis and follow-up of pneumoconiosis in most workforces at risk for pneumoconiosis are still based on the changes in the lung visible by standard X-ray techniques." *Id*. at 478. Nearly a decade ago,

Harvard Medical School Professor Theresa C. McLoud, M.D., reported on the research establishing that CT and HRCT scans, when evaluated by qualified experts, are "important diagnostic tool[s]" that have resulted in "major improvements in the assessment of occupational lung disease." T. McLoud, *Symposium: Occupational Lung Disease*, 30(6) RADIOL. CLIN. N. AM. ix (1992). Nevertheless, it remains the case that the results of such tests must be interpreted by qualified medical experts "in conjunction with the occupational history, clinical examination, and pulmonary function tests" of the miner, *id.*, including: (1) the results of x-ray, spirometry, blood gas or other tests; (2) the readings of MRI, ultrasonographic or gallium lung scans; and (3) the reasoned opinions of all the experts and physicians. *See Ziegler*, 23 F.3d at 1239; *Collins v. Director*, 932 F.2d 1191, 1194 (7th Cir. 1991) (Coffey, J., concurring).

We defer to the Department of Labor's reasonable judgment in resolving complex, technical issues that draw upon its familiarity and expertise with the diagnosis, prevention, and remediation of black lung disease. Since the evidence presented to the Department as of this date has raised reasonable doubts about the ability of CT scans, standing alone, to rule out pneumoconiosis, as defined by 20 C.F.R. § 718.201, the Department has flatly refused to conclude that a negative CT scan is a wildcard that must trump all other evidence. We thus refuse to hold that an ALJ in the exercise of her discretion and best judgment must always defer to the results of a CT scan when determining whether a miner has raised the 10-year presumption of disability or whether the coal company has subsequently rebutted the presumption of disability. *Usery*, 428 U.S. at 34; *Scott*, 144 F.3d at 1048.

Perhaps because Consol is aware of the absence of any regulatory requirement that a negative CT scan must trump all other evidence, the coal company also seeks reversal of ALJ Neal's decision because Consol disagrees with

the reasons the judge gave for discrediting the scan results in this particular case. This argument is without merit, for we may not "reweigh the evidence, resolve inconsistencies in the record, make credibility determinations, or substitute our inferences for those drawn below." *Summers*, 272 F.3d at 478. Upon review of the record, we are convinced that substantial evidence supported the judge's conclusion that the reader of the CT scan, Dr. Robert M. Bruce, lacked the necessary expertise, knowledge, and qualifications to offer a reliable opinion in the case under consideration.

The only physician who analyzed the CT scan is Dr. Bruce, who was retained by the coal company as part of these proceedings. The ALJ compared Dr. Bruce's opinions with Stein's medical history and the myriad of x-rays, spirometry, pulmonary function and blood gas test results, as well as the countervailing medical opinions of two qualified B-readers (Dr. Pathak and Dr. Mathur (who is also a board certified radiologist)) and found that Dr. Bruce's opinion was unreliable, stating that "[h]e possesses no special qualifications in the field of radiology and has no particular training or certification in examining . . . CT scans." Although the ALJ recognized that Dr. Bruce has otherwise impressive credentials, the judge noted that she was unpersuaded by the evidence proffered to establish that Dr. Bruce is experienced in examining CT scans for the diagnosis of legal pneumoconiosis. Accordingly, the judge ruled that Dr. Bruce's "opinion regarding the presence or absence of pneumoconiosis on any film is given very little weight," and we agree that this opinion is supported by the record.

As of this date, the Department of Labor has not issued guidelines for ALJs to follow when assessing the reliability of a physician's interpretation of a CT scan. In the absence of controlling statutory language or guidance from the agency, we defer to well-reasoned and well-documented decisions rendered by ALJs resolving the issues before them. We will affirm the judge's decision to award benefits unless

her analysis is irrational or unlawful. *See Director v. Midland Coal Co.*, 855 F.2d 509, 512 (7th Cir. 1988) (deferring to ALJ's own methodology when comparing the working conditions of surface miners and underground miners); *Eastern Assoc'd Coal Corp. v. Director*, 220 F.3d 250, 259 (4th Cir. 2000) (same when determining if miner has "massive lesions" in the lungs).

In this case, Judge Neal expressed legitimate concerns about the coal company's failure to lay a proper foundation from which she could rationally conclude that Dr. Bruce was qualified to interpret Stein's CT scan. Although agencies are not bound by the evidentiary strictures of *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993), litigants must still satisfy the ALJ that their experts are qualified by knowledge, training, or experience to, and have in fact applied recognized and accepted medical principles in a reliable way. *McCandless*, 255 F.3d at 468-49; *accord Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *GE Co. v. Joiner*, 522 U.S. 136 (1997).

Our research reveals that CT scans are typically read by radiologists (some of whom may in addition be classified as B-readers) who have specialized knowledge and have developed a certain expertise through years of training and experience interpreting this particular test. *See*, *e.g.*, J.F. Wiot & O. Linton, *The Radiologist and Occupational Lung Disease*, 175(2) AM. J. ROENTGEN. 311 (2000); Kim, *supra*; G. Kepler, *Clinical Overview of Occupational Lung Disease*, 30(6) RADIOL. CLIN. N. AM. 1121 (1992). Thus, it is of significance that Dr. Bruce is neither a qualified B-reader nor a board certified radiologist. It may very well be possible for a coal company to establish that a pulmonologist has the knowledge, training, and experience to review a CT scan and reliably discuss whether the test discloses the presence of legal pneumoconiosis, but in this case Consol failed to qualify Dr. Bruce as such an expert. Nothing in this record conclusively establishes that Dr. Bruce has any

experience or training with reading CT scans for the presence of *legal pneumoconiosis* (as opposed to other occupational diseases) or for purposes of *diagnosis* (as opposed to treatment). Nor did the coal company explain whether Dr. Bruce followed standard medical procedures when he examined Stein's CT scan, much less describe what those procedures might be. We refuse to hold that it was improper for Judge Neal to conclude that Dr. Bruce's opinions were unreliable. Furthermore, we decline to disturb Judge Neal's decision to invoke the presumption that Stein is totally disabled by pneumoconiosis.

**B.**

Because the ALJ properly found that Stein is eligible for black lung benefits, Consol was required to rebut this presumption by proving that: (1) Stein's disability was not caused by pneumoconiosis; (2) Stein is not, in fact, totally disabled; or (3) Stein's work experience did not contribute to or aggravate his disability in any material respect. 20 C.F.R. § 718.204(c); 65 Fed. Reg. at 79,946 (citing *Compton v. Inland Steel Coal Co.*, 933 F.2d 477, 481-83 (7th Cir. 1991)). The coal company attempted to establish that Stein's disability resulted entirely from chronic obstructive bronchitis induced by cigarette smoking. Thus, the burden was on the coal company to demonstrate that Stein's daily work-related exposure to coal dust over a period of eleven years "made only a negligible, inconsequential or insignificant contribution to [his] disability." 65 Fed. Reg. at 79,923; *see also Summers*, 272 F.3d at 482-83 (discussing burden of persuasion). The record speaks for itself and we are convinced that the ALJ's determination that the coal company failed to meet its burden of proof was proper.

Consol relies on the testimony of Dr. Bruce, who observed that Stein has a history of asthma and over the years was prescribed numerous medications for the treatment of bronchitis. Dr. Bruce noted that bronchodilator therapy re-

versed much of Stein's breathing problems and assisted in controlling his asthmatic episodes. Dr. Bruce also testified that Stein's pulmonary function reports, x-ray tests, and blood gas results were consistent with bronchitis rather than pneumoconiosis. He stated that he reviewed notations from an inpatient hospital chart, written in September 1991, describing Stein as a "heavy smoker." He further suggested that the slight presence of carboxyhemoglobin in Stein's oxygen saturation tests indicated that Stein was still smoking in May 1995, when he underwent his most recent physical examination. Thus, on the basis of these observations, Dr. Bruce concluded that smoking was the cause of Stein's suffering from chronic obstructive bronchitis and that coal mining failed to contribute to Stein's disability.

Dr. Robert A.C. Cohen disagreed with this conclusion. Dr. Cohen is a member of the faculty at the University of Illinois Medical School in Chicago and is board certified in internal medicine with a subspecialty in pulmonary diseases. Dr. Cohen responded to Dr. Bruce by pointing out that Stein and his treating physicians all averred that Stein quit smoking in the early 1970s. Dr. Cohen further testified that Stein's marginally depressed oxygen saturation rate "in no way proves" that Stein is a smoker, for the saturation of hemoglobin within the body is affected by numerous environmental factors (such as the patient's exposure to second-hand smoke or automobile fumes) and numerous physiological factors (such as the patient's body temperature, pH levels, and type of hemoglobin).

Dr. Cohen also testified, in opposition to Dr. Bruce, that Stein's substandard response to bronchodilator therapy indicated that he suffers from pneumoconiosis as well as obstructive lung diseases. Relying on the records of Stein's treating physician, Dr. Cohen deemed it significant that Stein had been hospitalized on several occasions for what doctors at downstate Illinois hospitals diagnosed as "asth-

ma of unknown cause." He stated that it is all too common for physicians to make such misdiagnoses—rather than diagnosing black lung disease—either because they are unaware of the miner's occupational exposures or because they are unfamiliar with recent literature and studies documenting the relationship between coal dust exposure and obstructive lung diseases. Accordingly, after a review of Stein's complete medical history, Dr. Cohen concluded that Stein's "eleven years of coal mine employment significantly contributed to the development of obstructive lung disease," that Stein's "tiny exposure to tobacco may also have been contributory to the development of his . . . disease," and that Stein is totally disabled by legal pneumoconiosis. 20 C.F.R. § 718.201.

Consolidation Coal claims that "Dr. Cohen's opinions are not well reasoned and should not have been adopted by the ALJ." This argument is doomed to fail, for in black lung adjudications, the decision of whether a medical opinion is reasoned is a decision that rests ultimately with the ALJ, not with us. *Summers*, 272 F.3d at 483.

Dr. Cohen is the director of the Black Lung Clinics Program at Cook County Hospital in Chicago and is a respected advisor to the HHS-funded National Coalition of Black Lung and Respiratory Disease Clinics. He is qualified as a B-reader, has published numerous articles dealing with occupational health diseases, and is in regular contact with other doctors from around the nation seeking consultations and evaluations from him concerning their patients. Thus, as we have previously recognized, it is "rational to give great weight to Dr. Cohen's views, particularly in light of his remarkable clinical experience and superior knowledge of cutting-edge research." *Id.* Moreover, there is "overwhelming scientific and medical evidence" supporting Dr. Cohen's opinion that exposure to coal dust can cause, aggravate, or contribute to obstructive lung diseases. 65 Fed. Reg. at 79,944 (citing *Freeman United Coal Mining Co.*

*v. OWCP*, 957 F.2d 302, 303 (7th Cir. 1992); *Old Ben Coal Co. v. Prewitt*, 755 F.2d 588, 591 (7th Cir. 1985)).

The petitioner makes the argument, based on a foundation of quicksand, that Dr. Cohen and the ALJ ignored evidence purportedly establishing that Stein is a "heavy smoker" who has smoked a half pack of cigarettes each week since the early 1970s. The petitioner, however, failed to submit an appendix or properly identify what portions of the record bolster this claim, and after a thorough review, we have been unable to locate such documentation in this record. Thus, Consol's "heavy smoker" argument is waived. *LSF Transp. Inc. v. NLRB*, 282 F.3d 972, 975 n.1 (7th Cir. 2002) (cautioning appellants "that they should not expect the court to peruse the record without the help of pinpoint citations").

In any event, unlike the coal company's haphazardly prepared pleadings, Stein's briefs have meticulously pointed us to several portions of the record confirming that his smoking history is limited to his first two years of high school, when he smoked no more than one or two cigarettes a week from 1970-72. During the administrative hearing in this case, for example, Stein was asked: "Did you ever smoke after high school?" and he responded, "No. . . . If I lit up a cigarette right now, they'd have to probably find me an oxygen tank. It would just take everything away." The ALJ credited Stein's poignant testimony on this issue, rejected the coal company's undocumented assertion that Stein has "a smoking history of the level expected to cause significant obstructive lung disease," and proceeded to grant Stein's petition for benefits. The record contains spirometry, blood gas, pulmonary function, and x-ray tests, along with the opinions of three physicians (all of whom are B-readers; one of whom is also a board certified radiologist) who are in agreement that Stein has black lung disease. We are convinced that there is ample support for Judge Neal's decision to award benefits and reject Dr. Bruce's contrary

opinion that the CT scan trumps this plethora of evidence. *See, e.g., R&H Steel Bldgs. Inc. v. Director*, 146 F.3d 514 (7th Cir. 1998).

## IV.

Although James E. Stein was a healthy young man when he first set foot upon Consolidated Coal Company's property, his work as a miner has left him with lungs that are now full of poison. Stein, 48, breathes only with the help of inhalers and a respiratory device. He can neither work nor exercise; he passes his days brewing and drinking coffee, watching television, and fishing in a small lake near his modest home in Murphysboro, Ill. Judge Neal's decision to award black lung benefits is lawful, rational, and supported by substantial evidence. The order of the Board is ENFORCED.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*