In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1430

FREEMAN UNITED COAL MINING CO.,

Petitioner,

v.

HERMAN E. SUMMERS,

Respondent.

Petition for Review from the Benefits Review Board
of the United States Department of Labor
BRB No. 00-0108 BLA

Argued SEPTEMBER 17, 2001--Decided November 15, 2001

  Before COFFEY, EASTERBROOK and WILLIAMS,
Circuit Judges.

  COFFEY, Circuit Judge.  Petitioner
Freeman United Coal Mining Company
("Freeman") appeals an order of the Bene
fits Review Board of the United States
Department of Labor, which granted
Respondent Herman E. Summers' ("Summers")
claim for relief under the Black Lung
Benefits Reform Act. We enforce the
decision of the Board.

I.  PROCEDURAL HISTORY

  This is the second time that Summers'
claim for benefits has come before the
court. Summers worked as a coal miner in
southern Illinois from 1948 to 1965 and
1974 to 1980. He retired and filed a
claim for black lung benefits October 9,
1980. After an administrative law judge
("ALJ") denied the request, the Board
remanded for further review and then
affirmed the denial. We upheld the
Board's order. Summers v. Freeman United
Coal Mining Co., 14 F.3d 1220 (7th Cir.
1994). Summers subsequently petitioned
the agency to modify its decision,
stating that he had obtained new medical
reports and data, which strengthened his
claim. An ALJ originally denied the
petition, but the Board reversed and
allowed Summers to supplement the record
with this additional information.

The case was remanded for further consideration before a new judge, Thomas M. Burke. After considering the record as a whole, ALJ Burke proceeded to award benefits in an order dated September 2, 1999. The Board affirmed. Freeman subsequently filed this appeal and argues that the ALJ erred in: (1) invoking the statutory presumption that Summers was totally disabled by pneumoconiosis; and (2) failing to find that this presumption was rebutted by the medical evidence submitted by the coal company, which suggested that Summers' disability is wholly attributable to severe asthma and is unrelated to his coal mining.

## II.  FACTUAL BACKGROUND

Summers was exposed to coal dust for most of his 23 years in the mining industry. Some of his exposure occurred while he was stationed in underground mines between May 1948 and November 1950 and April 1975 to August 1975. During the former period, Summers hung electrical wire and trolley wire in Old Ben Coal Company's #9 mine in West Frankfort, Ill. During the latter period, Summers upgraded the electrical equipment in the bottom of Freeman's #4 mine in Benton, Ill. Black dust permeated the working environment at Old Ben, and, according to Summers, there was "substantial coal dust" in the Benton mine as well.

The majority of Summers' exposure to coal dust, however, occurred when he worked inside the offices and shops that were built above ground on the coal company's property. Summers worked at the site of Freeman's United Crown Mine in Springfield, Ill., from November 1950 to July 1960 and the site of Freeman's #5 mine in Benton from July 1960 to April 1965. He was an unusually hard worker, putting in a straight shift plus one hour of overtime each weekday, and another overtime shift each Saturday. Moreover, he was on call around the clock. He left the coal company to work at Southern Illinois University in April 1965 but re turned in September 1974 to help overhaul the infrastructure of the #5 mine. After several months, he was promoted and transferred to Freeman's central offices in West Frankfort, where he was given responsibility for maintaining and repairing electrical equipment in all of the area's coal mines and processing

plants. Summers worked 5 days a week in this position until he retired in October 1980.

While in the central offices, Summers spent portions of almost every weekday inspecting Freeman's coal preparation plants and portions of one or two additional weekdays maintaining Freeman's underground mines. He described how the miners' activities in the preparation plants stirred up so much dust that he regularly left work with coal tracings all over his hair, eyebrows, and clothes. In fact, he stated that he was "probably" exposed to as much dust in the coal preparation plants as he was in the underground mines at Old Ben in the 1940s. Part of Summers' deposition reads as follows:

Q: Can you describe the coal preparation plant?

A: Well, depending on the plant, they are sometimes three, four, five stories high and it has all kinds of shakers. When the coal comes in, it's usually run over these shakers to size the coal to get the different sizes. They sell coal on order. Some companies want small coal, some want large coal. So this coal is run over these shakers so the small ones fall through, and then as it goes on it gets to the bigger ones, and there is a lot of dust in these preparation plants because they are handling coal all the time.

Q: Could you compare the dust generated at the coal preparation plant with the dust you were exposed to when you were working underground at Old Ben?
A: It's a difficult thing. I'd say it's pretty much the same . . . if you're around any of these shakers or if you're around where they are loading the coal in the coal cars, I would say that you are probably exposed to as much dust there as you are working underground.

Summers also explained that he was exposed to substantial levels of dust during his 15 years in Springfield and Benton. He divided his time among the coal preparation plants, the hoist rooms, and the repair shops. He worked at least once or twice a week for 15 minutes to several hours in the preparation plants, where the conditions mirrored those described above. In the hoist rooms,

where he worked for 60 to 90 minutes on weekdays and eight hours on Saturdays, machine generators hummed away with circulation fans stirring up coal dust while Summers lowered men into the mine shaft or performed routine maintenance tasks. Finally, in the repair shops, where Summers spent approximately 30 to 45 minutes a day, the dust so permeated the air that he would "always" leave work "covered with coal dust." The shops were one-room, 300 square-foot hovels with seven foot ceilings, a lone window, and no exhaust fans. Summers used an air hose to blow the coal dust off and out of the machines he restored; dust collected on the walls and the ceilings and needed to be swept out periodically. The company did not provide its employees with masks.

Summers described the hoist rooms as "very dusty areas" and the repair shops as some of "the dustiest areas" on the surface of the mine. Part of his deposition discusses the extent of his exposure as follows:

Q: What were the dustiest areas on the surface at the Crown Mine when you worked there?

A: The dustiest areas?

Q: Yes.

A: Well, the motor repair shop was one of the dustiest areas. The hoist room was certainly a dusty area, because in the front of this building we had this large hole where the two ropes went out that were tied on to these buckets. And that window was about, I'd say, five feet across and four feet up and down, and we're sitting there while they are loading coal cars right out in front of this building, and the prevailing winds would also blow it right into the hoist room. It was a very dusty area.

ALJ Burke took Summers' claim for black lung benefits under submission in 1998. The voluminous record included scores of x-rays, dozens of pulmonary function and blood gas tests, 11 reports from physicians, and several depositions and affidavits. The underlying facts were undisputed: the parties agreed that Summers has severe asthma and such obstructive lung diseases as emphysema,

chronic obstructive pulmonary disease ("COPD"), and bronchitis. The parties strongly disagreed, however, about the cause of these ailments. Two x-rays were positive for pneumoconiosis, but 15 were negative. Several doctors believed that Summers was totally disabled by asthma or COPD, but other experts concluded that his disability was substantially caused by his exposure to coal dust. The coal company relied mainly on the opinions of Dr. Gregory J. Fino; Summers bolstered his claim primarily with the reports of Dr. Robert A.C. Cohen and Dr. David M. Hinkamp. ALJ Burke concluded that Summers' own testimony raised an inference of disability caused, at least in part, by coal dust. The judge then turned to the medical evidence proffered by the coal company in an attempt to rebut this inference. He found this evidence unconvincing and, therefore, granted Summers' petition for benefits.

III.  STANDARD OF REVIEW

We review questions of law de novo, but we give the ALJ's factual findings considerable deference. We ask onlywhether the ALJ's decision is rational, supported by substantial evidence, and in accordance with the law. Peabody Coal Co. v. Helms, 859 F.2d 486, 489 (7th Cir. 1988). "Substantial evidence is 'such relevant evidence as a rational mind might accept as adequate to support a conclusion.'" Id. (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). We do not reweigh the evidence, resolve inconsistencies in the record, make credibility determinations, or substitute our inferences for those drawn below. Blakley v. Amax Coal Co., 54 F.3d 1313, 1322 (7th Cir. 1995); Amax Coal Co. v. Beasley, 957 F.2d 324, 327 (7th Cir. 1992).

IV.  DISCUSSION

A.  The 15-Year Presumption

The landmark Federal Coal Mine Health and Safety Act of 1969, as amended, is remedial legislation that is liberally construed to effectuate its purpose of improving the well-being of coal miners./1 One component of this legislation, the Black Lung Benefits Reform Act, 30 U.S.C. sec. 911 et seq., aids miners who are totally disabled by

black lung disease and establishes certain statutory presumptions that help remove the obstacles facing miners who seek to obtain such aid.

Because Summers' claim was filed prior to January 1, 1982, we apply what is known as the "15-year presumption" imposed by 30 U.S.C. sec. 921(c)(4). That is to say, we presume that Summers is disabled by pneumoconiosis if he can demonstrate that: (1) x-ray evidence is inconclusive; (2) but he has a totally disabling respiratory or pulmonary impairment; (3) and he is a coal miner; (4) who was employed for 15 years or more in either (a) an underground coal mine; or (b) it is determined that the conditions of his employment in a coal mine were substantially similar to conditions in an underground mine. Peabody Coal Co. v. Spese, 117 F.3d 1001, 1010 (7th Cir. 1997) (en banc). The miner is entitled to benefits unless the coal company overcomes this presumption with rebuttal evidence, the nature of which we discuss later in Part IV.B.

Freeman concedes the first two elements. The experts all agreed that Summers is totally disabled, and although the classic form of complicated black lung disease is usually discernible on chest x-rays, all but two of Summers' x-ray results were repeatedly negative. See Ziegler Coal Co. v. OWCP, 23 F.3d 1235, 1239 (7th Cir. 1994) (reversing award based on evidence "consisting solely of five negative x-ray readings and two positive readings"). Similarly, there is no serious dispute that Summers is a "coal miner," as defined by the relevant regulations./2 As part of his usual course of business, he worked directly on the coal company's property, either within or above the underground coal mines, maintaining or repairing machines that were indispensable to the extraction or preparation of coal. See Mitchell v. Director, OWCP, 855 F.2d 485, 490 (7th Cir. 1988); Amigo Smokeless Coal Co. v. Director, OWCP, 642 F.2d 68, 70 (4th Cir. 1981). Cf. Director, OWCP v. Ziegler Coal Co., 853 F.2d 529, 537 n.11 (7th Cir. 1988).

1. Conditions of employment

The next issue we address is whether Summers proved that he worked for at

least 15 years in an underground coal mine or in a coal mine with conditions substantially similar to those in an underground coal mine. Freeman contends that the record is barren of any objective facts from which the ALJ could have determined the conditions of Summers' workplace. Freeman argues that "even the most generous reading of Claimant's comparable work experience amounts to two years and nine months of actual work underground, and seven years of comparable surface work." We disagree.

The ALJ's finding of similarity was supported by Summers' unrefuted testimony about his employment conditions. In Director, OWCP v. Midland Coal Co., 855 F.2d 509 (7th Cir. 1988), we held that a surface or "strip" miner was not required to directly compare his work environment to conditions underground. Rather, the miner could establish similarity simply by proffering "sufficient evidence of the surface mining conditions in which he worked." It would then be "the function of the ALJ, based on his expertise and, we would expect, certain appropriate objective factors . . . to compare the surface mining conditions established by the evidence to conditions known to prevail in underground mines." Id. at 512. We conclude that Midland Coal's evidentiary framework logically applies in this case. "Coal mines" include all of the structures, facilities, and real or personal property "upon, under or above the surface" of land that is used for extracting or preparing coal. 20 C.F.R. sec. 725.101(a)(12). Summers intermittently labored underground or in buildings located atop subterranean coal mines, performing tasks inexorably intertwined with coal production. Therefore, he is a miner, according to the regulations, and we will not require him to prove similarity in a different manner merely because he did not wield a pickaxe and a shovel while he worked. The evidentiary burdens are the same for all miners covered under the Act. See Battaglia v. Peabody Coal Co., 690 F.2d 106, 110 (7th Cir. 1982) ("[t]he regulations draw no distinction between underground miners and aboveground miners.")

This is not to say, as the claimant asserted at oral argument, that a miner can prove similarity simply by showing that he was in or around a coal mine for

at least 15 years, without any further discussion of his employment conditions. Such a scintilla of evidence would not discharge the claimant's burden of proof. Yet on this record, we readily conclude that the ALJ's invocation of the presumption was proper. We find no merit to the coal company's claim that Summers simply made conclusory assertions such as, "The rooms were very dusty." To the contrary, we believe that Summers clearly delineated, in objective terms, the awful conditions on the surface of the mine. As we noted in Part II, Summers clearly and most vividly described how the tasks he performed in the repair shops, hoist rooms, and preparation plants resulted in dust exposure. He described how the wind and the exhaust fans aggravated that exposure, and he discussed the extent of that exposure. This unrebutted testimony, on its own terms, would have been sufficient for the ALJ, with his expertise and knowledge of the industry, to compare Summers' working conditions to those prevalent in underground mines. See Blakley, 54 F.3d at 1319. Furthermore, we note that Summers gave additional, convincing, and undisputed testimony that his job conditions above and below ground were "pretty much the same." The ALJ was bound to find similarity after receiving such testimony, for one cannot rationally ignore credible, uncontested evidence. See Peabody Coal Co. v. Lowis, 708 F.2d 266, 276 (7th Cir. 1983).

Freeman tells us that the ALJ erroneously analyzed the work environment because the judge mistakenly believed that Summers worked within 50 feet of the mine's tipple. In response, we remind the petitioner that just as the ALJ cannot mischaracterize testimony or take statements out of context, id., the coal company should not distort the record on appeal. Summers was asked, "How far was [the repair shop] from the tipple?" and he responded, "It was closer to the other shaft where the men went up and down. If you want to talk about that tipple, it was within 50 or 75 feet."/3 Our review convinces us that the ALJ drew rational inferences from this portion of the record and, indeed, the record as a whole. The judge then determined that Summers labored in conditions substantially similar to those underground. We will not disturb those findings. See Summers, 14 F.3d at 1225.

2.  The 125-day rule

   Given the findings of substantial similarity, the issue becomes whether Summers' work in the coal mines totaled 15 years, as that figure is defined by the Act and its enabling regulations. Summers clocked in five or six days a week over the course of 23 years. He worked in underground coal mines from May 1948 to November 1950 and April to August 1975, and he worked at underground coal mines inside miserable workrooms and processing plants from November 1950 to April 1965 and from August 1975 to October 1980.

   In arguing that Summers cannot invoke the 15-year presumption, Freeman assumes that an individual working above ground must prove that he was exposed to substantial coal dust for the same number of working hours that an underground miner would spend in subterranean conditions over the course of 15 years of full-time employment. Using Freeman's figures, this would be at least 28,800 working hours or 3,600 eight-hour working days./4 The company added up the total number of hours that Summers spent working underground and working in the surface repair shops, hoist rooms, and coal preparation plants. The company then divided that figure by eight in order to calculate Summers' total daily exposure to coal dust. Because this number does not equal 3,600, the company believes that the ALJ improperly invoked the 15-year presumption./5 We are sure this is wrong. See 20 C.F.R. sec. 718.301.

   For purposes of calculating a miner's length of employment, a year is defined as one calendar year, or partial periods totaling one year, during which the miner has worked "in or around a coal mine or mines for at least 125 'working days.'" Id. sec. 725.101(a)(32). "A 'working day' means any day or part of a day for which a miner received pay for work as a miner, but shall not include any day for which the miner received pay while on an approved absence, such as vacation or sick leave." Id. "If the evidence establishes that the miner worked in or around coal mines at least 125 working days during a calendar year or partial periods totaling one year, then the miner has worked one year in coal mine

employment for all purposes under the Act." Id. sec. 725.101(a)(32)(i). Thus, Summers was not required to establish that he worked underground for more than 125 days per annum. See Landes v. OWCP, 997 F.2d 1192, 1198 (7th Cir. 1993) (quoting Yauk v. Director, OWCP, 912 F.2d 192, 195 (8th Cir. 1989)). Nor did he have to prove that he was around surface coal dust for a full eight hours on any given day for that day to count towards the 125-day total. See Griffith v. Director, OWCP, 868 F.2d 847, 849 (6th Cir. 1989). All that Summers had to show was that he worked "in or around a coal mine" for any part of 125 days in a calendar year, for a total of 15 years. This he unquestionably did, by demonstrating that he was exposed to work-related dust five or six days each week from May 1948 to April 1965 and from April 1975 to October 1980. The ALJ then rationally determined that Summers was exposed to substantially the same conditions as underground miners. On this record, we conclude that the ALJ properly invoked the 15-year presumption. As a result, the burden shifted to the coal company to demonstrate either that: (1) Summers does not have pneumoconiosis; (2) is not totally disabled; or (3) is not disabled by pneumoconiosis. Peabody Coal Co. v. Director, OWCP, 165 F.3d 1126, 1128 (7th Cir. 1999); Amax Coal Co. v. Burns, 855 F.2d 499, 500 (7th Cir. 1988).

B.  The Rebuttal Burden

  Legal pneumoconiosis (as opposed to clinical pneumoconiosis) is defined as a chronic dust disease of the lung and its sequelae, including chronic, restrictive, or obstructive respiratory and pulmonary impairments arising out of coal mine employment. Underhill v. Peabody Coal Co., 687 F.2d 217, 223 n.10 (7th Cir. 1982); 30 U.S.C. sec. 902(b). Coal-induced dust diseases arising from mine employment include all chronic pulmonary diseases or respiratory or pulmonary impairments that are significantly related to, or substantially aggravated by exposure to coal dust during coal mine employment. 20 C.F.R. sec. 718.201.
  Freeman attempted to prove that Summers does not have, or is not disabled by pneumoconiosis. "The proper causation standard requires that black lung disease be a necessary, though it need not be a sufficient, condition of the miner's

total disability." Shelton v. Old Ben Coal Co., 933 F.2d 504, 508 (7th Cir. 1991). In other words, at this juncture, the coal company must prove that Summers would have been able to continue working in the mines had it not been for pneumoconiosis. Peabody Coal Co. v. Director, OWCP, 165 F.3d 1126, 1128 (7th Cir. 1999); Freeman United Coal Mining Co. v. Anderson, 973 F.2d 514, 518 (7th Cir. 1992). The ALJ determined that Freeman did not carry its burden, and we agree.

On appeal, Freeman relies on the testimony of Dr. Gregory J. Fino, who observed that Summers has a long history of allergies and severe asthma. Dr. Fino testified that Summers' FEV1 values fluctuated on various tests, which he said is consistent with asthma but not dust-related respiratory ailments. Dr. Fino recognized that bronchodilator therapy failed to completely reverse Summers' asthmatic symptoms and acknowledged that this lack of reversibility is unusual. However, he discounted this evidence because 10 percent of asthmatics fail to respond to such treatment. Dr. Fino concluded that Summers: (1) does not have black lung disease or any other occupationally-acquired pulmonary condition; and (2) is totally disabled due to asthma. He says Summers "would be as disabled as I find him now had he never stepped foot in the mines."

Dr. Robert A.C. Cohen and Dr. David M. Hinkamp disagreed. Dr. Cohen deemed it significant that much of Summers' two decades of exposure occurred before the enactment of federal dust control standards. He agreed that Summers' FEV1 values fluctuated, but he testified that Summers' consistently subnormal FEV1/FVC9 values were symptomatic of a coal-induced obstructive disease other than asthma. Dr. Cohen added that Summers' poor response to bronchodilators further indicated that a coal-related disease significantly contributed to his respiratory impairments. Dr. Cohen, therefore, attributed Summers' disability to a combination of factors, including coal dust exposure, asthma, and several years of smoking prior to 1971. Dr. Hinkamp similarly concluded that coal was an important contributing factor to Summers' disability. Dr. Hinkamp

determined that Summers' x-ray and pulmonary function tests indicated a large amount of air trapping and reversible bronchospasms that could not be attributable solely to adult onset asthma.

The ALJ discussed this evidence, made a finding that Dr. Cohen and Dr. Hinkamp had performed sound medical analyses, and, in turn, expressly gave their testimony greater weight than Dr. Fino's. The ALJ was impressed with their command of medical literature, as well as Dr. Cohen's extensive training, experience at black lung clinics across the nation, directorship of the Black Lung Clinics Program at Cook County Hospital, and advisory capacity with the National Coalition of Black Lung and Respiratory Disease Clinics. The ALJ explained that Dr. Cohen's report "is well reasoned, discusses the pertinent medical records, and shows a great level of knowledge regarding the medical literature as it pertains to coal-induced lung disease." Dr. Cohen "elaborated on these opinions during [his] deposition testimony in a well reasoned and knowledgeable manner," and was supported by Dr. Hinkamp, who performed his own independent analysis of the record. We are convinced that the ALJ had a rational, substantial basis to find that Dr. Cohen "creditably" rebutted Dr. Fino's opinions, particularly with respect to the inferences that may be drawn from Summers' response to bronchodilator therapy./6

Freeman argues that the ALJ "erred by preferring Dr. Cohen's unfounded claims to the well-reasoned analysis of Dr. Fino, which makes clear that Claimant's mining work was not a contributing cause of his long-standing asthmatic condition." Whether a medical opinion is reasoned, however, is a decision that rests ultimately with the ALJ, not with us. Freeman United Coal Mining Co. v. Cooper, 965 F.2d 443, 448 (7th Cir. 1992); Migliorini v. Director, OWCP, 898 F.2d 1292, 1296 (7th Cir. 1990); Arch Mineral Corp. v. OWCP, 798 F.2d 215, 221 (7th Cir. 1987). It was rational to give great weight to Dr. Cohen's views, particularly in light of his remarkable clinical experience and superior knowledge of cutting-edge research. See Blakley, 54 F.3d at 1322. It also was rational to discount Dr. Fino's opinions,

based on a finding that they were not supported by adequate data or sound analysis./7 See Dempsey v. OWCP, 811 F.2d 1154, 1162 (7th Cir. 1987); see also Piney Mountain Coal Co. v. Mays, 176 F.3d 753, 763 (4th Cir. 1999) ("the reliability of a given opinion is not necessarily revealed by the forcefulness of the speaker's language.")

Even if Dr. Cohen's testimony is fully credited, Freeman claims to have successfully rebutted the presumption that it caused Summers' black lung disease, because Dr. Cohen stated that he could not determine with any precision what percentage of Summers' impairment was caused by asthma, cigarette smoking, or coal mine dust. We have held, however, that doctors need not make such particularized findings. The ALJ needs only to be persuaded, on the basis of all available evidence, that pneumoconiosis is a contributing cause of the miner's disability. Compton v. Inland Steel Coal Co., 933 F.2d 477, 483 (7th Cir. 1991); Hawkins v. Director, OWCP, 907 F.2d 697, 701 (7th Cir. 1990). We note, furthermore, that the ALJ relied on more than simply the testimony of Dr. Cohen. The judge based his ruling on "the opinions of Dr. Cohen and Dr. Hinkamp, and . . . the totality of the evidence, including all of the medical opinions, test results, and hospital records."/8 The ALJ specifically noted his review of two x-rays that indicated black lung disease and statements from two doctors, who examined Summers in 1982 and 1994, and determined that coal dust either aggravated or contributed to Summers' respiratory problems./9 This evidence, which the coal company does not contest on appeal, further supports the ALJ's findings. See Blakley, 54 F.3d at 1322 (affirming decision; noting that judge "did not limit his review of the evidence to one study or witness").

V.  CONCLUSION

This case forced ALJ Thomas M. Burke to resolve complex issues on the basis of a voluminous record that is full of conflicting opinions. The judge did exactly what he was supposed to do: give these varying opinions more or less weight based on his view of the credibility of the witnesses, the reliability of their medical analyses,

and the depth of support for their conclusions. See Peabody Coal Co. v. McCandless, 255 F.3d 465, 469 (7th Cir. 2001) (offering guidance to administrative factfinders). Herman E. Summers was a healthy young man when he first stepped into the coal mines of southern Illinois. Today, he is a feeble octogenarian whose lungs are full of poison. Freeman United Coal Mining Company is legally responsible. The time to pay up is now--more than 21 years after this claim was first filed. Judge Burke's decision to award black lung benefits is lawful, rational, and supported by substantial evidence. The order of the Board is AFFIRMED.

FOOTNOTES

/1 Although the medical community has recognized the relationship between coal mining and debilitating respiratory illnesses for more than a century, "[t]he human and economic burden of occupational disease in general and dust diseases in particular was often ignored in the process of industrialization." Michael Gochfeld, M.D., Books, 25 J. Health Pol. Pol'y & L. 782, 782 (2000) (reviewing Alan Derickson, Black Lung: Anatomy of a Public Health Disaster (1998)). "[T]he first fifty years of the twentieth century saw a systematic attempt by the coal producers to downplay, misrepresent, or discredit the evidence [of mine-related health risks]. Their cause was abetted by a number of industry-supported physicians who managed to dominate the literature and professional discussion with claims that coal dust was relatively harmless and did not damage miners' lungs." Id. at 783.

/2 "Miner or coal miner means any individual who works or has worked in or around a coal mine or coal preparation facility in the extraction or preparation of coal. The term also includes an individual who works or has worked in coal mine construction or transportation in or around a coal mine, to the extent such individual was exposed to coal mine dust as a result of such employment (see sec. 725.202). . . ." 20 C.F.R. sec. 725.101(a)(19).

   "Coal preparation means the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing and loading of bituminous coal, lignite or anthracite, and such other work of preparing coal as is usually done by the operator of the mine." Id. sec. 725.101(a)(13).

/3 Summers' Dep. at 9.

/4 8 hours/day x 5 days/week x 48 weeks/year x 15 years = 28,800 hours.

/5 Pet'r Br. at 14-15.

/6 September 2, 1999 Order ("Order") at 17.

/7 Dr. Fino stated in his written report of August 30, 1998 that "there is no good clinical evidence in the medical literature that coal dust inhalation in and of itself causes significant obstructive lung disease." (Br. Supp. Pet. Modif'n at 23 (March 10, 1999)). During a rulemaking proceeding, the Department of Labor considered a similar presentation by Dr. Fino and concluded that his opinions "are not in accord with the prevailing view of the medical community or the substantial weight of the medical and scientific literature." 65 Fed. Reg. 79,920, 79,939 (Dec. 20, 2000).

/8 Order at 18.

/9 Id. at 4, 14-15.