PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CONSOLIDATION COAL COMPANY,
                    *Petitioner,*

          v.

BILLY D. WILLIAMS; DIRECTOR,
OFFICE OF WORKERS' COMPENSATION
PROGRAMS, UNITED STATES
DEPARTMENT OF LABOR,
                    *Respondents.*

No. 05-2108

On Petition for Review of an Order of the
Benefits Review Board.
(04-756-BLA)

Argued: May 26, 2006

Decided: July 13, 2006

Before MOTZ, GREGORY, and DUNCAN, Circuit Judges.

Petition denied by published opinion. Judge Gregory wrote the opinion, in which Judge Motz and Judge Duncan joined.

## COUNSEL

**ARGUED:** William Steele Mattingly, JACKSON & KELLY, P.L.L.C., Morgantown, West Virginia, for Petitioner. Helen Hart Cox, UNITED STATES DEPARTMENT OF LABOR, Office of Workers' Compensation Programs, Washington, D.C.; Robert F. Cohen, Jr., COHEN, ABATE & COHEN, Morgantown, West Virginia, for

Respondents. **ON BRIEF:** Howard M. Radzely, Solicitor of Labor, Christian P. Barber, Counsel for Appellate Litigation, UNITED STATES DEPARTMENT OF LABOR, Office of the Solicitor, Washington, D.C., for Respondent Director, Office of Workers' Compensation Programs.

## OPINION

GREGORY, Circuit Judge:

Consolidation Coal Company ("Consolidation") petitions for review of a final decision issued by the Benefits Review Board ("Board") of the Department of Labor ("DOL") affirming an award of black lung benefits by an Administrative Law Judge ("ALJ") to Billy D. Williams under the Federal Coal Mine Health & Safety Act of 1969 ("Act"), 30 U.S.C. § 901 *et seq.* For the reasons that follow, we affirm the Board's decision and deny the petition.

I.

Billy D. Williams was a coal miner for at least thirty years. In 1957, Williams began his employment as a mechanic and welder in one of Consolidation's preparation plants. In his last position, he performed the same duties at one of Consolidation's outside coal mine shops from 1981 to 1987, at which point he retired due to shortness of breath.

On July 27, 1995, Williams filed his first claim for black lung benefits before the DOL. While the claim was pending, Dr. Jerome J. Lebovitz examined Williams on September 28, 1995, and sent a letter dated November 9, 1995 with attached reports to Williams's counsel. Dr. Lebovitz's letter stated his view that Williams was "permanently and totally disabled secondary to the entity of Coal Worker's Pneumoconiosis." J.A. 23. Despite receiving the letter, neither Williams nor his counsel sent it to the DOL.

At the DOL's request, Dr. Andrzej J. Jaworski examined Williams on October 30, 1995. Dr. Jaworski ultimately concluded that Wil-

liams's respiratory impairments would not prevent him from performing his position as a shop mechanic. Thereafter, on January 11, 1996, the DOL denied Williams's claim for benefits.

On June 6, 2001, Williams filed a second claim for black lung benefits. In connection with this claim, five physicians examined Williams. First, Dr. Prasad V. Devabhaktuni took x-rays of Williams's lungs on July 31, 2001, and diagnosed Williams with hypertension, chronic obstructive pulmonary disease secondary to smoking, and coal worker's pneumoconiosis secondary to occupational dust exposure. During his deposition, Dr. Devabhaktuni testified that Williams's chronic obstructive pulmonary disease resulted primarily from his smoking habits, but that his coal mine dust exposure could have contributed to the impairment. In addition, Dr. Devabhaktuni stated that he diagnosed coal worker's pneumoconiosis based on the x-rays and Williams's occupational history.

Second, Dr. Joseph J. Renn, III examined Williams on October 31, 2001, and determined that Williams suffered from chronic bronchitis with obstruction secondary to cigarette smoking. Dr. Renn also concluded that coal mine dust exposure did not contribute to Williams's chronic bronchitis, and that Williams did not have pneumoconiosis. Finally, Dr. Renn opined that Williams would be able to perform his last position as a shop mechanic.

Third, Dr. John E. Parker performed pulmonary function studies on Williams, and reviewed the reports prepared by Drs. Devabhaktuni and Renn. In reviewing Williams's x-rays, Dr. Parker concluded that they did not establish pneumoconiosis. Nevertheless, Dr. Parker cited several studies in support of his view that "people with coal mine dust exposure may have airflow obstruction with a normal radiograph . . . ." J.A. 168. Based on these studies, Dr. Parker opined that people with pneumoconiosis could exhibit small opacities of the 0/1 type, and that it was unusual for an elderly patient such as Williams to have rounded changes of that nature. For these reasons, Dr. Parker concluded that Williams's lungs likely contained some macules of pneumoconiosis.

Dr. Parker further determined that Williams suffered from chronic obstructive pulmonary disease resulting from a "combination of

tobacco smoke inhalation as well as work place dust exposure." J.A. 85. Dr. Parker admitted that it was impossible to apportion the cause of Williams's airflow obstruction between exposure to cigarette smoking or coal mine dust. However, Dr. Parker declined to rule out coal dust exposure as a cause of Williams's airflow obstruction using Dr. Renn's approach, which examined the mid-max expiratory flow rate, because, in Dr. Parker's view, the mid-max expiratory flow rate was an unreliable indicator subject to daily variance. Dr. Parker thus concluded that Williams's lung injury definitely arose, at least in part, from coal dust exposure "because he was a coal miner and . . . because his chest radiograph was not normal." J.A. 179. Ultimately, Dr. Parker opined that Williams's breathing impairment would prevent him from returning to his last position as a shop mechanic.

Fourth, Dr. David M. Rosenberg reviewed the medical reports prepared by Drs. Jaworski, Lebovitz, Devabhaktuni, and Renn, as well as readings performed by other physicians of an x-ray taken on October 31, 2001. As an initial matter, Dr. Rosenberg determined that the x-rays did not establish pneumoconiosis. Although Dr. Rosenberg noted some moderate obstruction in Williams's airways, he opined that this condition was due to tobacco smoke, and not coal mine dust exposure. Finally, because Williams's maximum voluntary ventilation (MVV) appeared normal, Dr. Rosenberg concluded that Williams could return to his previous coal mining position.

Fifth, Dr. Robert A.C. Cohen reviewed the medical reports prepared by Drs. Devabhaktuni, Renn, Parker, and Rosenberg, and conducted his own x-rays, physical exam, and pulmonary function tests on July 15, 2003. Dr. Cohen concluded that Williams suffered from coal worker's pneumoconiosis based on the following considerations: (1) Williams's significant occupational exposure to coal mine dust for thirty-one years; (2) Williams's symptoms of chronic lung disease, which included "progressively worsening shortness of breath and cough and wheezing" and "sputum production"; (3) pulmonary function studies indicating moderate obstruction with diffusion impairment; (4) arterial blood gases showing mild hypoxemia; and (5) a chest x-ray indicating a positive reading for "opacities consistent with classical pneumoconiosis at a profusion of 1/0." J.A. 223. Dr. Cohen opined that even setting aside the x-ray evidence, he would still con-

clude that Williams demonstrated clinical and physiological signs of pneumoconiosis.

Dr. Cohen asserted that Drs. Renn, Rosenberg, and Jaworksi incorrectly concluded that coal mine dust exposure failed to contribute to Williams's obstructive lung disease. In citing several academic studies, Dr. Cohen argued that coal mine dust can cause significant airflow obstruction. Specifically, Dr. Cohen argued that these studies established a correlation between coal mine dust exposure and substantial decreases in lung function, forced vital capacity, forced expiratory volume in one second, forced expiratory flow, and carbon monoxide diffusion capacity. Ultimately, Dr. Cohen concluded that Williams's lung impairments would prevent him from performing his previous job as a shop mechanic.[1]

On September 11, 2003, the ALJ held a hearing on Williams's second claim for black lung benefits. Although the parties raised a host of evidentiary issues, the ALJ expressed its intention to admit the exhibits in their entirety, note the objections, and permit post-hearing motions to strike. Williams subsequently presented testimony in support of his claim. Immediately after the close of Williams's case, Consolidation moved for summary judgment, asserting that Williams's second claim was barred by the three-year time limitation triggered by Dr. Lebovitz's report under 20 C.F.R. § 725.308. The ALJ provisionally denied the motion with leave to renew the motion in post-hearing submissions.

The ALJ then addressed Williams's outstanding motion to compel with respect to fourteen interrogatories served prior to the hearing. Upon representation from counsel that Consolidation had disclosed all of the records relevant to the experts' diagnoses, Williams withdrew the motion to compel with respect to interrogatories one through four (which sought all x-rays, medical reports, and records relevant to Williams's case).

---

[1]Dr. Rosenberg subsequently responded in a written rebuttal to Dr. Cohen's report. In this letter, Dr. Rosenberg attempted to discredit the scholarly citations provided by Dr. Cohen.

With respect to the remaining interrogatories, Consolidation argued that they were irrelevant and overly burdensome. In rejecting Consolidation's objection to Williams's interrogatory five, which sought the number of referrals Consolidation had made to Dr. Renn, the ALJ opined that it was relevant to "show bias and a number of referrals." J.A. 401. After Williams agreed to limit the interrogatory to referrals from Consolidation to its counsel, and to a time period of 1999 to 2002, the ALJ granted the motion to compel.

With respect to interrogatory six, which sought the number of cases in which Dr. Renn had found pneumoconiosis, the ALJ and Consolidation became engaged in an increasingly heated exchange. Ultimately, in granting the motion to compel with respect to interrogatory six, the ALJ specifically stated "[t]his is discovery. I'm not making any findings." J.A. 410.

As the ALJ addressed interrogatories seven through fourteen, which addressed issues of bias for Drs. Renn and Rosenberg, Consolidation again asserted that the information sought was irrelevant to bias. In granting the motion to compel with respect to these interrogatories, the ALJ stressed that the discovery requests were "reasonable." J.A. 417.

Following the hearing, the ALJ issued a formal order dated December 9, 2003 explaining its reasons for compelling discovery. In that order, the ALJ stated that "[b]ased on many years of involvement in expert testimony as an examiner, cross examiner, and administrative law judge, I am convinced that doctors are no less biased by money and by longstanding relations with patients, law firms and the law firms' clients than is anyone else." J.A. 458. After noting that Dr. Renn testified frequently on behalf of coal mine companies for black lung cases—and specifically, in cases involving Consolidation's counsel—the ALJ determined that the probative value of the discovery relating to possible bias outweighed the burden of compliance. The ALJ reserved decision on Williams's motion to exclude the reports of Drs. Renn and Rosenberg.

After the Board denied Consolidation's interlocutory appeal of the ALJ's December 9, 2003 order, the ALJ issued a second discovery order dated March 2, 2004, directing Consolidation to release infor-

mation responsive to interrogatories five through fourteen. On April 14, 2004, an en banc panel of the Board denied Consolidation's request for reconsideration. Consolidation nevertheless refused to comply with the discovery orders and did not disclose any of the requested information.

On April 16, 2004, the ALJ denied Consolidation's renewed motion for summary judgment concerning the timeliness of Williams's second claim for black lung benefits, and set a briefing schedule regarding the benefits determination. After considering the parties' briefs, the ALJ issued its decision granting Williams black lung benefits on June 1, 2004. In its opinion, the ALJ resolved several preliminary matters that are relevant to the present petition for review. Specifically, the ALJ (1) granted Williams's motion to strike Dr. Lebovitz's report; (2) denied Consolidation's request to reassign the case to another judge; (3) denied Consolidation's third motion for dismissal based on the statute of limitations; and (4) declined to strike the reports of Drs. Renn and Rosenberg as a discovery sanction for Consolidation's noncompliance with the ALJ's December 9, 2003 and March 2, 2004 orders. The ALJ then expressed its intent to treat the reports proffered by Drs. Renn and Rosenberg "as if [Consolidation] had complied with discovery and as if its responses to that discovery had demonstrated significant bias by both witnesses toward employers as a class and [its law firm's] clients as a class." J.A. 490.

With respect to its merits determination, the ALJ credited the opinions of Drs. Parker and Cohen over the opinions of Drs. Renn and Rosenberg. In so doing, the ALJ made the following findings of fact: (1) Dr. Parker had credentials that were superior to those of Drs. Renn and Rosenberg; (2) the opinions of Drs. Cohen and Parker were more reasoned and persuasive than the opinions of Drs. Renn and Rosenberg; (3) Drs. Renn and Rosenberg did not exhibit a contemporary knowledge of medical research; and (4) Drs. Renn and Rosenberg misunderstood the heavy-lifting aspects of Williams's work.

On August 8, 2005, the Board affirmed the ALJ's disposition of the matter in its entirety. Consolidation has petitioned for review of the Board's decision, asserting that (1) Williams's second claim for benefits was untimely; (2) the ALJ was biased against Consolidation and coal mine companies in general; (3) the ALJ abused its discretion in

making certain discovery and evidentiary rulings; and (4) the ALJ improperly credited the opinions of Drs. Cohen and Parker in awarding benefits to Williams.

## II.

## A.

We apply de novo review to the legal conclusions made by the Board and the ALJ. *Consolidation Coal Co. v. Held*, 314 F.3d 184, 186 (4th Cir. 2002). In addition, we engage in an independent review of the record to determine whether substantial evidence exists to support the ALJ's findings of fact. *Island Creek Coal Co. v. Compton*, 211 F.3d 203, 207 (4th Cir. 2000). Substantial evidence is "'more than a mere scintilla.'" *Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 528 (4th Cir. 1998) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Specifically, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 528 (internal quotation marks and citations omitted).

## B.

Consolidation first contends that Williams's black lung claim, which was filed more than three years after he received Dr. Lebovitz's diagnosis of totally disabling coal worker's pneumoconiosis, was untimely. Section 932 of Title 30 provides that any claim for benefits "shall be filed within three years after whichever of the following occurs later—(1) a medical determination of total disability due to pneumoconiosis; or (2) March 1, 1978." 30 U.S.C. § 932(f). The implementing regulation, 20 C.F.R. § 725.308, further explains that the three-year statute of limitations is triggered when the miner receives a medical determination of total disability arising from pneumoconiosis:

> A claim for benefits filed under this part by, or on behalf of, a miner shall be filed within three years after a medical determination of total disability due to pneumoconiosis which has been communicated to the miner or a person responsible for the care of the miner, or within three years

after the date of enactment of the Black Lung Benefits Reform Act of 1977, whichever is later.

20 C.F.R. § 725.308(a).

The facts of this appeal present an unusual situation in which Williams received Dr. Lebovitz's diagnosis in 1995, but failed to submit that diagnosis prior to the DOL's ultimate denial of his first claim for black lung benefits in 1996. Thereafter, Williams filed his second claim for benefits in 2001—six years after he learned of Dr. Lebovitz's diagnosis. Thus, we must determine, as a threshold matter, whether Williams's receipt of Dr. Lebovitz's report triggered the three-year statute of limitations for his second claim.

This issue of first impression causes us to consider our en banc decision in *Lisa Lee Mines v. Director, Office of Workers' Compensation Programs*, 86 F.3d 1358 (4th Cir. 1996), which discussed the appropriate standard applied to a miner's subsequent claim for black lung benefits in light of a prior denial of benefits. In *Lisa Lee Mines*, we recognized the finality considerations that attach to a prior denial of black lung benefits. *Id.* at 1361 (holding that a prior denial of benefits is "'final' in a legal sense"). Specifically, the legal conclusion attendant with a prior denial—i.e., that the miner was not eligible for benefits at the time of that decision—must be accepted as correct and "is as off-limits to criticism by the respondent as by the claimant." *Id.* This rule of finality, we reasoned, is responsive to the general difficulty in accurately diagnosing pneumoconiosis:

> Accepting the correctness of a final judgment is more than legalistic tunnel vision; it is a practical—perhaps the only practical—way to discern a concrete form in the mists of the past. The ease we might feel at second-guessing *this* final judgment ought not tempt us to overestimate our retrospective perspicacity; most black lung claims involve a mixed bag of test results and wildly divergent medical opinions. The final decision of the ALJ (or BRB or claims examiner) on the spot is the best evidence of the truth at the time.

*Id.*

Because a prior denial is both final and correct, *Lisa Lee Mines* rejected the test articulated by the Seventh Circuit in *Sahara Coal Co. v. Director, Office of Workers' Compensation Programs*, 946 F.2d 554 (7th Cir. 1991), which required the miner to show that he "did not have black lung disease at the time of the first application but has since contracted it and become totally disabled by it, or that his disease has progressed to the point of becoming totally disabling although it was not at the time of the first application." *Id.* at 556. In so doing, we reasoned that *Sahara Coal* improperly "permit[ted]—in fact demand[ed]—a plenary review of the evidence behind the first claim" by forcing the miner to affirmatively prove that each of the ALJ's adverse determinations underlying the prior denial was correct. *Lisa Lee Mines*, 86 F.3d at 1363. To accommodate the finality considerations that attach to a prior denial, we instead adopted a standard that presumed that the factual determinations underlying a prior denial are correct and simply required the miner to disprove the "continuing validity" of at least one of the elements previously adjudicated against him in showing a material change in conditions. *Id.*

Although *Lisa Lee Mines* primarily addressed the appropriate test applied to subsequent claims, the principles of finality expressed within the decision clearly bear on this appeal. In light of *Lisa Lee Mines*, we must accept the DOL's denial of Williams's first claim in 1996 as final and correct, regardless of whether the DOL reviewed Dr. Lebovitz's diagnosis in adjudicating the claim. For this reason, the DOL's legal determination that Williams was not totally disabled due to coal worker's pneumoconiosis as of January 11, 1996 necessarily refuted Dr. Lebovitz's diagnosis that Williams had contracted the disease by that point. Moreover, because we must treat Dr. Lebovitz's diagnosis, for legal purposes, as a misdiagnosis in light of the denial of Williams's first claim, we must similarly conclude that the (mis)diagnosis had no effect on the statute of limitations for his second claim. *See Wyoming Fuel Co. v. Director, Office of Workers' Comp. Programs*, 90 F.3d 1502, 1507 (10th Cir. 1996) ("[A] final finding by an Office of Workers' Compensation Program adjudicator that the claimant is not totally disabled due to pneumoconiosis repudiates any earlier medical determination to the contrary and *renders prior medical advice to the contrary ineffective to trigger the running of the statute of limitations.*" (emphasis added)).

Our conclusion is consistent with the Act's view of pneumoconiosis, its treatment of subsequent claims, and its remedial purpose. First, the Act explicitly recognizes that pneumoconiosis is a "latent and progressive disease. . . ." 20 C.F.R. § 718.201(c). Based on this understanding of pneumoconiosis, we have acknowledged that "nothing bars or should bar claimants from filing claims *seriatim*, and the regulations recognize that many will." *Lisa Lee Mines*, 86 F.3d at 1362. *See also id.* ("The health of a human being is not susceptible to once-in-a-lifetime adjudication." (citing treatise)); *id.* at 1364 ("[Pneumoconiosis] is a progressive disease, and no rational system of law or of medicine could stand on the proposition that it can or must be measured only once."). Although Consolidation relies on certain dicta expressed in the Sixth Circuit's decision in *Tennessee Consolidated Coal Co. v. Kirk*, 264 F.3d 602, 608 (6th Cir. 2001), which suggests that misdiagnoses can trigger the statute of limitations for subsequent claims,[2] the progressive nature of the disease dictates that "a claimant must be free to reapply for benefits if his first filing was premature." *Sharondale Corp. v. Ross*, 42 F.3d 993, 996 (6th Cir. 1994). We see no reason why a miner who has been denied benefits

---

[2]Specifically, the Sixth Circuit stated in *Tennessee Consolidated Coal*:

> The three-year limitations clock begins to tick *the first time* that a miner is told by a physician that he is totally disabled by pneumoconiosis. This clock is not stopped by the resolution of the miner's claim or claims, and . . . the clock may only be turned back if the miner returns to the mines after a denial of benefits. There is thus a distinction between premature claims that are unsupported by a medical determination, like Kirk's 1979, 1985, and 1988 claims, and those claims that come with or acquire such support. Medically supported claims, even if ultimately deemed "premature" because the weight of the evidence does not support the elements of the miner's claim, are effective to begin the statutory period. . . . Three years after such a determination, a miner who has not subsequently worked in the mines will be unable to file any further claims against his employer, although, of course, he may continue to pursue pending claims.

*Tennessee Consol. Coal*, 264 F.3d at 608 (footnote omitted). A different panel of the Sixth Circuit later disavowed this dicta in an unpublished disposition. *Peabody Coal Co. v. Director, Office of Workers' Comp. Programs*, 48 Fed. Appx. 140, 147 (6th Cir. Oct. 2, 2002).

because he presented legally insufficient medical evidence must be forever barred from bringing a new claim even if he later develops pneumoconiosis. *See Wyoming Fuel*, 90 F.3d at 1507 ("[A] claimant should not be barred from bringing a duplicate claim when his or her first claim was premature because the claimant's conditions had not yet progressed to the point where the claimant met the Act's definition of total disability due to pneumoconiosis." (internal citations omitted)).

Second, the Act's treatment of subsequent claims reveals the inherent unfairness in running the statute of limitations based on Dr. Lebovitz's diagnosis. In balancing the Act's view of pneumoconiosis as a latent and progressive disease with the need for administrative repose, the duplicate claims regulation, 20 C.F.R. § 725.309(d), directs that subsequent claims "shall be denied" based on the earlier denial unless the miner demonstrates a material change in conditions. Under *Lisa Lee Mines*'s construction of § 725.309(d), the miner must "*prove*, under all of the probative medical evidence of his condition *after* the prior denial, at least one of the elements previously adjudicated against him." *Lisa Lee Mines*, 86 F.3d at 1362.[3] Thus, only new evidence *following* the denial of the previous claim, rather than evidence predating the denial, can sustain a subsequent claim. *Id. See also Wyoming Fuel*, 90 F.3d at 1509 ("In considering whether a claimant established a material change, the ALJ can consider only new evidence which relates to the conditions at the time of the second claim."); *Labelle Processing Co. v. Swarrow*, 72 F.3d 308, 316 (3d Cir. 1996) ("If [the miner's] earlier exposure to coal dust caused his present disability and pneumoconiosis was merely latent at the time of his initial application for benefits but has since become manifest, [the miner] would be entitled to prove that the disease has progressed to the point of total disability since the filing of his original claim."); *Sharondale*, 42 F.3d at 996 ("[T]he claimant cannot prevail on a duplicate claim unless he shows a 'material change' in his condition;

---

[3]In light of the fact that subsequent claims measure the miner's worsened condition after a prior denial, subsequent claims avoid res judicata issues because "common-law *res judicata* has no applicability where the issue is a person's health at two different times." *Lisa Lee Mines*, 86 F.3d at 1362 n.9.

thus, the critical evidence in assessing whether to reopen the claim is the evidence accruing since the previous denial.").

In light of the standard articulated in *Lisa Lee Mines*, we note that Dr. Lebovitz's diagnosis, which related solely to Williams's condition in *1995*, could not have sustained a subsequent claim that his condition had materially worsened since the initial denial of benefits in *1996*. It would be illogical and inequitable to hold that a diagnosis that could not sustain a subsequent claim could nevertheless trigger the statute of limitations for such a claim.

Third, the Act's remedial nature instructs us to interpret its provisions favorably toward miners. *See Labelle*, 72 F.3d at 318 ("[C]ourts should liberally construe remedial legislation, such as the [Act], so as to include the largest number of claimants within its entitlement provisions."). Keeping the remedial purpose in mind, we recognize that a rule holding that misdiagnoses could ultimately bar claims for benefits will create a substantial chilling effect discouraging miners from seeking early examinations and second opinions. *See Peabody Coal*, 48 Fed. Appx. at 147 ("If a miner knows that a misdiagnosis will ultimately mean that he can never again seek benefits should he eventually contract this progressive disease, he will be less likely to be proactive in seeking medical advice during the early stages."). The health consequences stemming from this chilling effect would be undoubtedly dire. Moreover, we are cognizant of the difficulty in accurately diagnosing pneumoconiosis. Thus, the rule we fashion today simply seeks to reconcile the "mixed bag of test results and wildly divergent medical opinions" usually attendant with black lung claims with the Act's remedial purpose of awarding benefits to deserving miners. *Lisa Lee Mines*, 86 F.3d at 1361.

We therefore hold that a medical determination later deemed to be a misdiagnosis of pneumoconiosis by virtue of a superseding denial of benefits cannot trigger the statute of limitations for subsequent claims. Applying this rule to the facts of this appeal, we find that Dr. Lebovitz's diagnosis did not trigger the statute of limitations for Williams's second claim. Moreover, having no further objections from Consolidation, we presume that Williams's second claim was otherwise timely. 20 C.F.R. § 725.308(c) (setting forth a rebuttable pre-

sumption that the miner's claim was timely). Accordingly, we conclude that Williams's second claim was timely.

## C.

Having disposed of the timeliness issue, we turn to Consolidation's assertion that the Board improperly affirmed the ALJ's decision declining to recuse itself from the case. Specifically, Consolidation argues that the ALJ's comments at the hearing and within the discovery order demonstrated its bias against coal mine companies. We find no merit in these contentions.

The Supreme Court has explained that bias in judicial decision-making refers to "a favorable or unfavorable disposition or opinion that is somehow *wrongful* or *inappropriate* either because it is undeserved, . . . rests upon knowledge that the subject ought not to possess[,] . . . [or] is excessive in degree . . . ." *Liteky v. United States*, 510 U.S. 540, 550 (1994). In this context, the Court set forth the standard for finding judicial bias:

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

*Id.* at 555.

Here, the challenged remarks followed Consolidation's objection to Williams's interrogatory six, which sought the number of cases in which Dr. Renn had diagnosed pneumoconiosis. The ensuing colloquy between Consolidation's counsel and the ALJ proceeded as follows:

| COUNSEL: | Judge, that's impossible for me to determine without doing [sic] back through every client. |
|---|---|
| JUDGE CAMPBELL: | Well then, you're going to have to do it. |
| COUNSEL: | What does that show us? That doesn't show us anything. |
| JUDGE CAMPBELL: | It shows bias. Come on, [Counsel], you know that. |
| COUNSEL: | No, it doesn't. |
| JUDGE CAMPBELL: | *This area of the law is shot through with hacks. And I'm frankly tired of it.* |
| COUNSEL: | *Judge, are you calling Dr. Renn a hack?* |
| JUDGE CAMPBELL: | *No. But he might be. He perfectly well might be.* |
| COUNSEL: | No. |
| JUDGE CAMPBELL: | And this is what we're trying to find out. |
| COUNSEL: | No. |
| JUDGE CAMPBELL: | Stop arguing. I've let you go as far as I'm going to let you go. That's it. |
| COUNSEL: | Your Honor? |
| JUDGE CAMPBELL: | No. You're getting me upset now. |

J.A. 408-09 (emphases added). In its written order granting Williams's motion to compel, the ALJ expressed its concern that "[b]ased on many years of involvement in expert testimony as an examiner, cross examiner, and administrative law judge, I am convinced that doctors are no less biased by money and by longstanding relations with patients, law firms and the law firms' clients than is anyone else." J.A. 458. After noting that Drs. Renn and Rosenberg testified frequently on behalf of coal mine companies, *see* J.A. 458-59,[4] the ALJ determined that Williams's requested discovery related to bias was appropriate.

In our view, the ALJ's comments express the unremarkable proposition that experts can be biased, and that doctors in coal mine cases are no less subject to bias than other experts. *See Woodward v. Director, Office of Workers' Comp. Programs*, 991 F.2d 314, 321 (6th Cir. 1993) ("[E]xperts hired exclusively by either party tend to obfuscate rather than facilitate a true evaluation of a claimant's case."). *See also Grizzle v. Picklands Mather and Co./Chisolm Mines*, 994 F.2d 1093, 1101 (4th Cir. 1993) (Hall, J., dissenting) ("Disability, or the lack thereof, seems inevitably in the eye of the *paid* beholder." (emphasis added)). Upon representation from counsel, the ALJ properly determined that the frequency with which Drs. Renn and Rosenberg testified on behalf of coal mine companies justified discovery concerning potential bias. *See Underwood v. Elkay Mining, Inc.*, 105 F.3d 946, 951 (4th Cir. 1997) ("[T]he ALJ should consider the qualifications of the experts, the opinions' reasoning, their reliance on objectively determinable symptoms and established science, their detail of analysis, *and their freedom from irrelevant distractions and prejudices*." (emphasis added)); *id.* ("[T]he ALJ should consider whether an opinion was, to any degree, the product of bias in favor of the party retaining the expert and paying the fee.").

Similarly, the tone and tenor of frustration expressed in the ALJ's comments do not, in and of themselves, establish bias against Consolidation. *Liteky*, 510 U.S. at 555-56 ("*Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imper-

---

[4]The ALJ also noted that Dr. Renn frequently submitted reports on behalf of Consolidation's counsel. J.A. 458.

fect men and women, even after having been confirmed as federal judges, sometimes display."). At the outset of the hearing, the ALJ stated that it did not want to resolve the evidentiary issues without written submissions. Consolidation nevertheless repeatedly raised outstanding discovery issues, including Williams's motion to compel with respect to its interrogatories seeking discovery related to bias. Throughout the discussion of these interrogatories, Consolidation interrupted the ALJ, continued to press objections, and reiterated its position that the requested discovery was not relevant. Given counsel's behavior, it is not surprising that the ALJ became annoyed. *Liteky*, 510 U.S. at 556 ("A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.").

Finally, we note that, to the extent that Consolidation challenges the discovery order itself as indicative of bias, "judicial rulings alone almost never constitute a valid basis for a bias or partiality ruling." *Liteky*, 510 U.S. at 555 (internal citation omitted). Accordingly, we affirm the Board's determination that the ALJ did not demonstrate bias against Consolidation or coal mine companies in general.

## D.

Consolidation further challenges several discovery and evidentiary rulings made by the ALJ. Specifically, Consolidation argues that the ALJ erred by (1) reserving ruling on and later granting Williams's discovery requests even though they sought irrelevant information, imposed burdensome costs, and were untimely; (2) striking Dr. Lebovitz's diagnosis from the record and substituting Dr. Cohen's report; and (3) applying an adverse inference to the reports submitted by Drs. Renn and Rosenberg as a discovery sanction and excluding their supplemental reports. We shall address each contention *seriatim*.

## 1.

Consolidation first contends that the ALJ's decision to reserve ruling on Williams's motion to compel deprived it of a meaningful hearing. We disagree. Section 725.455 of Title 20 of the Code of Federal Regulations provides that "[t]he conduct of the hearing and the order in which allegations and evidence shall be presented shall be within

the discretion of the administrative law judge and shall afford the parties an opportunity for a fair hearing." 20 C.F.R. § 725.455. No statute or regulation, however, requires an administrative law judge to rule on discovery motions prior to the merits hearing. In light of the considerable discretion afforded to administrative law judges in conducting hearings, we decline to find error in the ALJ's decision to reserve ruling on Williams's motion.

We similarly find no abuse of discretion with respect to the ALJ's decision to grant Williams's motion to compel. As discussed above, the ALJ properly determined that discovery concerning potential bias was relevant to impeaching the credibility of Drs. Renn and Rosenberg. Moreover, Consolidation has failed to offer anything more than conclusory assertions regarding the potentially burdensome aspect of the discovery requests, despite having numerous opportunities to substantiate its objections before the ALJ.

In addition, we reject Consolidation's remaining argument that the ALJ could not grant the motion to compel because the requested discovery would be untimely and therefore inadmissible under 20 C.F.R. § 725.456(b). Section 725.456(b) provides that where a party seeks to admit documentary evidence that was not exchanged twenty days prior to the hearing and cannot establish good cause for its lateness, the ALJ shall exclude the evidence or remand to the district director for consideration of the evidence. In this instance, however, *Consolidation* never disclosed the requested discovery even though Williams served the interrogatories on July 11, 2003—two months prior to the hearing. Consolidation's own recalcitrance in refusing to disclose the requested discovery therefore created any untimeliness issues. Accordingly, we conclude that the ALJ properly exercised its discretion in granting Williams's motion to compel.

2.

Consolidation next argues that the ALJ abused its discretion by permitting Williams to substitute Dr. Cohen's medical report for Dr. Lebovitz's medical report. Considering that 20 C.F.R. § 725.414 limits a miner to submitting two medical reports in support of his claim, we believe that the ALJ properly permitted Williams to designate the two reports (out of the three filed) he wished to submit in support of

his claim. *See Dempsey v. Sewell Coal Co.*, 23 BLR 1-47 (BRB 2004) (en banc) (holding that "the administrative law judge acted within his discretion when he permitted employer to select which two of its three medical reports employer would submit as its affirmative case").[5] We therefore find that the ALJ did not abuse its discretion in striking Dr. Lebovitz's report and admitting Dr. Cohen's report in its place.

3.

Consolidation further maintains that the ALJ erred in applying an adverse inference of bias to the reports of Drs. Renn and Rosenberg. Significantly, however, Consolidation has not challenged the ALJ's *other* reasons for discrediting Drs. Renn and Rosenberg. These reasons were articulated as follows: (1) Dr. Parker had credentials that were superior to those of Drs. Renn and Rosenberg; (2) the opinions of Drs. Cohen and Parker were more reasoned and persuasive than the opinions of Drs. Renn and Rosenberg; (3) Drs. Renn and Rosenberg did not exhibit a contemporary knowledge of medical research; and (4) Drs. Renn and Rosenberg misunderstood the heavy-lifting aspects of Williams's work. Thus, with or without the application of the adverse inference, the ALJ had proper reasons for finding that the reports proffered by Drs. Renn and Rosenberg were unpersuasive.

In addition, Consolidation has failed to provide any indication that the supplemental reports proffered by Drs. Renn and Rosenberg would have cured the defects the ALJ found in their original reports. Accordingly, we find that any errors concerning the ALJ's consideration of the reports proffered by Drs. Renn and Rosenberg were harmless.[6] *See Ngarurih v. Ashcroft*, 371 F.3d 182, 190 n.8 (4th Cir. 2004) (reversal of an administrative ruling is unnecessary if the error was harmless).

---

[5]We further note, as the Board pointed out, that because the ALJ addressed Dr. Lebovitz's report in connection with the timeliness issue, Consolidation was not unduly prejudiced by the exclusion of the report.

[6]In addition, any error arising from the exclusion of x-ray rebuttal evidence is harmless because the ALJ determined that the x-ray evidence did not establish medical pneumoconiosis.

E.

Finally, Consolidation raises several challenges to the ALJ's factual findings underlying its ultimate award of benefits to Williams.[7] These contentions are without merit.

Consolidation first contends that the ALJ failed to express the weight afforded to Dr. Devabhaktuni's opinion. However, the record demonstrates that the ALJ explicitly discredited Dr. Devabhaktuni's opinion because he "seemed to have been testifying in terms of total disability for purposes of Social Security benefits entitlement . . . ." J.A. 494. Thus, this argument is unsupported by the record.

Consolidation next asserts that Dr. Parker's failure to apportion Williams's lung impairment between cigarette smoke and coal mine dust exposure discredited his medical report. Although Dr. Parker could not establish the precise percentage of Williams's lung obstruction attributable to cigarette smoke and coal mine dust exposure, "doctors need not make such particularized findings." *Freeman United Coal Mining Co. v. Summers*, 272 F.3d 473, 483 (7th Cir. 2001). *See also Cornett v. Benham Coal, Inc.*, 227 F.3d 569, 576 (6th Cir. 2000) (holding that the miner "was not required to demonstrate that coal dust was the *only* cause of his current respiratory problems"); *Consol. Coal Co. v. Swiger*, 98 Fed. Appx. 227, 237-38 (4th Cir. May 11, 2004) (same). Indeed, "[t]he ALJ needs only to be persuaded, on the basis of all available evidence, that pneumoconiosis is a contributing cause of the miner's disability." *Freeman United Coal Mining*, 272 F.3d at 483. *See also* 20 C.F.R. § 718.201(b) (the miner is required to show that his lung disease was "significantly related to, or substantially aggravated by," coal mine dust exposure).

Although Dr. Parker acknowledged that either cigarette smoking or coal mine dust could have caused Williams's airflow obstruction, he explained that the mid-max expiratory rate, the factor upon which Dr. Renn relied to rule out coal mine dust as a potential cause of Williams's airflow obstruction, was an unreliable variable. In addition, Dr. Parker supported his view that coal mine dust contributed to Wil-

---

[7]Because Williams filed his claim in 2001, his claim is subject to the permanent regulations set forth in 20 C.F.R. § 718 *et seq.*

liams's airflow obstruction by citing four types of scientific studies: (1) studies comparing lung function in miners and non-miners; (2) studies of the patterns of lung functions and symptoms related to the miner's level of coal mine dust exposure; (3) studies of the mortality rate from chronic obstructive pulmonary disease due to coal mine dust exposure; and (4) autopsy studies of the relationship between emphysema in coal miners with their previous exposure to coal mine dust. Dr. Parker further substantiated his conclusion that Williams had suffered totally disabling coal worker's pneumoconiosis by relying on the rounded abnormalities apparent on Williams's x-rays, the pulmonary function studies and diffusion capacity test, and Williams's extensive history of coal mine employment.

We believe that the ALJ properly relied on Dr. Parker's well-reasoned report in determining that Williams was entitled to black lung benefits. Any error arising from the ALJ's reliance on additional sources, such as Dr. Cohen's report, was therefore harmless. Accordingly, we find that the ALJ's benefits determination is supported by substantial evidence, and affirm the award.

### III.

We agree with the Board's determination that the ALJ committed no errors of law and made findings of fact supported by substantial evidence. We also conclude that the award of black lung benefits to Williams was appropriate, and therefore deny Consolidation's petition in its entirety.

*PETITION DENIED*